UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BIMBO BAKERIES USA, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>CHRIS BOTTICELLA,<br><br>        Defendant. | Civil Action No. _____ |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTIONS FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION AND OTHER RELIEF**

Michael L. Banks
Victoria L. Gorokhovich
Kasturi Sen
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
215-963-5387/5642/5600
mbanks@morganlewis.com
vgorokhovich@morganlewis.com
ksen@morganlewis.com

Attorneys for Plaintiff
BIMBO BAKERIES USA, INC.

January 15, 2010

# **TABLE OF CONTENTS**

I. INTRODUCTION ............................................................................................................. 1

II. STATEMENT OF FACTS ............................................................................................... 2

III. ARGUMENT ..................................................................................................................... 5

    A. The Court Should Issue A Preliminary Injunction To Prevent Irreparable Harm To Plaintiff From The Inevitable Disclosure Of Plaintiff's Trade Secrets If Defendant Is Permitted To Work For Hostess As A Vice President Of Bakery Operations. ........................................................................................................... 5

        1. Plaintiff Is Likely To Succeed On The Merits And Obtain A Permanent Injunction Prohibiting Or Severely Restricting Defendant's Employment With Hostess. ................................................................................................ 5

            a. Plaintiff is likely to prevail on its misappropriation of trade secrets claim. ............... 5

                (i) Defendant is in possession of trade secrets belonging to Plaintiff. ...................... 6

                (ii) Defendant's anticipated employment at Hostess would inevitably lead to the disclosure of Plaintiff's trade secrets. ................................................................. 9

            b. Plaintiff is likely to prevail on its breach of contract claim. ..................................... 10

        2. Plaintiff Will Suffer Irreparable Harm Without Injunctive Relief Because Defendant Will Inevitably Disclose Plaintiff's Trade Secrets And Confidential Information To Hostess. ............................................................................................................ 11

        3. Defendant Will Not Suffer Any Irreparable Harm If Injunction Is Issued. ................... 12

        4. A Preliminary Injunction Is In The Public Interest. ..................................................... 13

    B. The Court Should Issue A Temporary Restraining Order To Prevent Immediate Irreparable Harm To Plaintiff Pending A Hearing On The Motion For A Preliminary Injunction ................................................................................................................ 13

        1. Irreparable Harm Will Result If Relief Is Delayed. ..................................................... 13

        2. Additional Notice To Defendant Should Not Be Required. ........................................ 14

IV. CONCLUSION ................................................................................................................ 14

# TABLE OF AUTHORITIES

## FEDERAL CASES

American Greetings Corp. v. Dan-Dee Imports, Inc.,
  807 F.2d 1136 (3d Cir. 1986) ................................................................. 13

Emergency Care Research Institute v. Guidant Corp.,
  No. 06-1898, 2007 WL. 2702455 (E.D. Pa. Sept. 12, 2007) ................. 6, 7

Fisher Bioservices, Inc. v. Bilcare, Inc.,
  No. 06-567, 2006 WL. 1517382 (E.D. Pa. May 31, 2006) ..................... 13

Graphic Management Associate, Inc. v. Honegger,
  No. 94-0825, 1994 WL. 59369 (E.D. Pa. Feb. 25, 1994) ....................... 13

National Business Services, Inc. v. Wright,
  2 F. Supp. 2d 701 (E.D. Pa. 1998) .......................................................... 11

Opticians Association of America v. Independent Opticians of America,
  920 F.2d 187 (3d Cir. 1990) ..................................................................... 5

PepsiCo, Inc. v. Redmond,
  54 F.3d 1262 (7th Cir. 1995) .................................................................. 10

SI Handling System, Inc. v. Heisley,
  753 F.2d 1244 (3d Cir. 1985) ............................................................... 7, 8

## STATE CASES

A.M. Skier Agency, Inc. v. Gold,
  747 A.2d 936 (Pa. Super. 1989) ........................................................... 7, 8

Air Products & Chemical, Inc. v. Johnson,
  442 A.2d 1114 (1982) ..................................................................... 6, 8, 9

Den-Tal-Ez, Inc. v. Siemens Capital Corp.,
  566 A.2d 1214 (Pa. Super. 1989) ......................................................... 7, 8

O.D. Anderson, Inc. v. Cricks,
  815 A.2d 1063 (Pa. Super. Ct. 2003) ....................................................... 6

Omicron Systems, Inc. v. Weiner,
  860 A.2d 554 (Pa. Super Ct. 2004) .......................................................... 8

Pestco, Inc. v. Associate Products, Inc.,
    880 A.2d 700 (Pa. Super. Ct. 2005) ............................................................................... 7

## FEDERAL RULES

Fed. R. Civ. P. 65(a) ......................................................................................................... 1, 5, 15

Fed. R. Civ. P. 65(b) ......................................................................................................... 2, 13, 14

## STATE STATUTES

12 Pa. Con. Stat. Ann. § 5302 ................................................................................................. 6

## MISCELLANEOUS

Restatement of Torts § 757 comment b (1939) ...................................................................... 7

I. **INTRODUCTION**

On January 4, 2010, Chris Botticella, a twenty-year veteran of Bimbo Bakeries USA ("BBakeries") and its predecessors, announced his retirement effective January 15, 2010. He has no intention of retiring, however, and deceived BBakeries with his announcement. Instead, Botticella has accepted a job for one of BBakeries' competitors: Hostess Brands, Inc. ("Hostess") on January 18, 2010. BBakeries learned of Botticella's plans on January 13, 2010, from sources other than Botticella. Botticella only confessed his true plans when directly confronted by senior management. Between January 4th and January 13th, Botticella continued in his role as Vice President of Operations for BBakeries' Western Region, participating in confidential strategy meetings and exchanging e-mails containing highly confidential trade secrets. He did not even excuse himself from a meeting on January 7, 2010, where other participants strategized about how to compete with Hostess in the snack-cake market.

Botticella has not provided company management with details of his position at Hostess, much less how he plans to maintain the confidentiality of BBakeries' trade secrets. To make maters worse, Botticella attempted to cover his tracks by instructing his secretary to delete information on his laptop computer before his employment at BBakeries even ended.

In light of Botticella's lack of forthrightness and deceptive tactics, BBakeries has no practical choice but to seek a status quo injunction, at least delaying Botticella's commencement of work for Hostess until BBakeries can discover what Botticella's role would be at Hostess and whether it will be possible to prevent the inevitable disclosure of BBakeries' trade secrets and other confidential information subject to a binding confidentiality agreement.

As of today, January 15, 2010, Botticella is still an employee of BBakeries. BBakeries is therefore presently moving for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), upon notice to Botticella and hearing, and an immediate ex parte temporary

restraining order pursuant to Federal Rule of Civil Procedure 65(b), to preserve the status quo. In order to prevent any prejudice to Botticella while this discovery is ongoing, while a temporary restraining order is in effect preventing Botticella from commencing employment at Hostess, BBakery will voluntarily continue his salary until a hearing on the motion for a preliminary injunction, or such time as the parties agree or the Court directs otherwise.

## II.  STATEMENT OF FACTS

BBakeries and its affiliates manufacture, sell and market various fresh baked breads, rolls, cakes and other similar products throughout the United States, including products under the brands Arnold, Boboli, Brownberry, Entenmanns's, Mrs Baird's, Thomas' and Stroehmann. (January 15, 2010 Declaration of Daniel P. Babin ("Babin Decl.") at ¶ 2.)

Botticella has been employed by BBakeries or its affiliates or predecessors (collectively "BBU") for approximately twenty years. (Id. at ¶ 3.) Currently, Botticella is the Vice President of Operations for BBakeries' Western Region. (Id. at ¶ 4.) In that capacity, he has direct responsibility for five production facilities and also oversees "co-packers" operations within his region. (Id. at ¶ 4.) Through his employment, Botticella has acquired the knowledge necessary to produce many of BBU's products without reference to written recipes or instructions. (Id. at ¶ 5.) For example, Botticella is one of less than ten people in the world with full knowledge of how to produce Thomas' English Muffins, famous for their distinctive "nooks and crannies" characteristics (Id. at ¶ 6.) BBU has gone to great lengths to keep secret the recipe and process for making Thomas' English Muffins for over seventy-five years. (Id.) Indeed, a facility in Placentia, California that produces Thomas' English Muffins came under Botticella's supervision after January 21, 2009 and, as a result Botticella was required to execute a Confidentiality, Non-Solicitation and Invention Assignment Agreement ("Confidentiality

2

Agreement"). (Id. at ¶ 7.) He did so on March 13, 2009.[1] (Id.) By way of further example, Botticella has full knowledge necessary to produce Sandwich Thins, a new product that has proven wildly popular in the marketplace since its introduction in 2009. (Id. at ¶ 8.)

These and other production trade secrets are closely guarded through the use of confidentiality agreements and limitations on access to knowledge. (Id. at ¶ 10.) In general, such information is shared with employees only on a need-to-know basis, so that most employees possess information only directly relevant to their assigned task. (Id.) Very few employees, such as Botticella, possess all of the knowledge necessary to produce a finished product. (Id.)

In addition to trade secrets relating directly to production, Botticella has been privy to trade secrets and confidential information relating to virtually every aspect of BBU's business, including expansion plans and propriety trade secrets relating to production efficiency. (Id. at ¶ 12.) Botticella is also privy to highly sensitive and confidential cost structure, promotion and customer strategies for the sale of most, if not all, of BBakeries products.[2] (Id. at ¶ 14.) If a competitor were to know BBU's precise costs for production and/or promotional and customer strategies, as Botticella does, they would have a substantial unfair advantage when setting prices and bidding for contracts. (Id.)

On January 4, 2010, Botticella submitted notice of his resignation effective January 15, 2010. (Id. at ¶ 15.) Botticella informed his direct superior that he was retiring, and led the Company to believe he had no future employment plans. (Id. at ¶ 16.) Based on that

---

[1]  The Confidentiality Agreement contains a choice of law and exclusive venue provision, by which the parties consented to the jurisdiction of Pennsylvania state and federal courts in or near Montgomery County and agreed that Pennsylvania law shall govern. (Id. at Ex. A, ¶ 15.)

[2]  Because of the nature of such trade secrets, details regarding trade secrets such as expansion plans, production efficiency and cost structure cannot be divulged without a protective order preserving the confidentiality of such information, so the evidence accompanying this memorandum is necessarily limited. Plaintiff is prepared, however, to present additional evidence to the Court in camera at a hearing on the motion for a preliminary injunction.

3

belief, Botticella was permitted to continue working at BBakeries without a formal transition plan or a debriefing on his ability and willingness to protect the company's trade secrets after his employment ended. (Id. at ¶ 17.) Moreover, he was allowed continued access to BBU's most sensitive information, both in the form of emails and participation in meetings. (Id..) Under no circumstances would he have been allowed to continue to receive such highly confidential information had senior management known that he was going to work for a competitor. (Id.)

On January 13, 2010, BBakeries learned that Botticella had actually accepted a job with Hostess and was planning to begin work there on January 18, 2010. (Id. at ¶¶ 18-19.) Botticella's anticipated job title at Hostess is Vice President Bakery Operations – East. (Id. at ¶ 20.) The duties of that position include responsibility for bakery cost performance, quality, and staff development in the eastern region. (Id.) Those duties will inevitably require Botticella to draw on trade secrets learned during the course of his employment at BBakeries, as described above. (Id.)

For example, Botticella's responsibilities at BBakeries included the development and production of super premium breads, such as those marketed under the Oroweat and Arnold brand names. (Id. at ¶ 21.) Hostess has been attempting for years to break into the super premium bread market, without success. (Id.) Botticella's knowledge of trade secrets relating to BBU's highly successful and profitable super premium breads would be invaluable to Hostess in its attempts to develop a successful product. (Id..)

Not only did Botticella deceive management about his post-departure plans, Botticella continued to avail himself of confidential information and trade secrets after he announced his departure without disclosing his conflict of interest. (Id. at ¶ 22-23.) For example, on January 7, 2010, Botticella participated in a meeting where specific strategies were discussed for competing

4

with Hostess in the snack-cake market. (Id. at ¶ 23.) Botticella made no effort to excuse himself when it became apparent that he was acquiring competitive information directly relevant to his soon-to-be employer. (Id.) In addition to this deception and lack of disclosure, senior management has discovered that Botticella attempted to destroy evidence during his departure by instructing his secretary to delete his computer's hard drive before returning it to human resources. (Id. at ¶ 24.)

### III. ARGUMENT

#### A. The Court Should Issue A Preliminary Injunction To Prevent Irreparable Harm To Plaintiff From The Inevitable Disclosure Of Plaintiff's Trade Secrets If Defendant Is Permitted To Work For Hostess As A Vice President Of Bakery Operations.

In exercising its discretion to issue a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), a district court must consider four factors:

> [A] the likelihood that the applicant will prevail on the merits at final hearing; [B] the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; [C] the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and [D] the public interest.

Opticians Ass'n of Am. v. Independent Opticians of Am., 920 F.2d 187, 191-92 (3d Cir. 1990) (internal citations omitted). Here, all four factors weigh heavily in favor of an injunction.

#### 1. Plaintiff Is Likely To Succeed On The Merits And Obtain A Permanent Injunction Prohibiting Or Severely Restricting Defendant's Employment With Hostess.

##### a. Plaintiff is likely to prevail on its misappropriation of trade secrets claim.

Under Pennsylvania law prohibiting the misappropriation of trade secrets, an employer may be irreparably harmed and therefore entitled to injunctive relief if an ex-employee accepts new employment that "is likely to result in the disclosure of information, held secret by [the] former employer, of which the employee gained knowledge as a result of his former employment

situation." <u>Air Prods. & Chem., Inc. v. Johnson</u>, 442 A. 2d 1114, 1120 (1982). Here, Plaintiff can establish that Defendant knows BBU's trade secrets, and that Defendant's anticipated employment at Hostess is likely to result in the disclosure of such trade secrets.

     (i) **Defendant is in possession of trade secrets belonging to Plaintiff.**

Under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), a trade secret is defined as:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. Con. Stat. Ann. § 5302.

The relevant factors under Pennsylvania law are "substantial secrecy and competitive value to the owner." <u>Emergency Care Research Inst. v. Guidant Corp.</u>, No. 06-1898, 2007 WL 2702455, at *4 (E.D. Pa. Sept. 12, 2007) quoting <u>O.D. Anderson, Inc. v. Cricks</u>, 815 A. 2d 1063, 1070 (Pa. Super. Ct. 2003)

In analyzing those factors, courts consider six subfactors:

> (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

6

SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1256 (3d Cir. 1985) (citing Restatement of Torts § 757 comment b (1939)); accord Emergency Care Research Inst, 2007 WL 2702455, at *5; Pestco, Inc. v. Assoc. Prods., Inc., 880 A. 2d 700, 706 (Pa. Super. Ct. 2005)).

Here, consideration of the relevant factors and the record presented to the Court compels the conclusion that the relevant information constitutes trade secrets under the PUTSA. First, the information at issue has been kept secret. The information at issue includes production processes, sales information, cost-structure data and detailed marketing and production plans unknown to those outside BBU. (See Babin Decl. at ¶¶ 5-14.) BBU has closely guarded the trade secrets at issue, not only from competitors but also within the company. For example, information about production technologies is provided on a strict need-to-know basis, and employees are frequently required to execute confidentiality agreements. (Babin Decl. at ¶ 10.) This factor, therefore, weighs heavily in favor of an injunction  See A.M. Skier Agency, Inc. v. Gold, 747 A. 2d 936, 941 (Pa. Super. 1989) (finding that restricting access, for example through the use of password, was evidence of confidentiality as was provision in employee handbook stating that employer owned client information).

Likewise, the value of such relevant information can hardly be overstated. For example, Botticella's trade secrets include confidential cost-structure information that would permit Hostess a competitive advantage in bidding against BBakeries, and would allow Hostess to replicate BBU's efficiency methods that provide a substantial competitive advantage. (See Babin Decl. at ¶¶13-14.) See Den-Tal-Ez, Inc. v. Siemens Capital Corp., 566 A. 2d 1214, 1230 (Pa. Super. 1989), 1230 (finding that confidential cost-structure information such as "details unit cost and product-by-product profit margin data," including "a whole gamut of labor cost, overhead [and] materials," are trade secrets because they can be used to determine a competitor's

pricing methods and thus compete more effectively) (internal citation omitted). It is irrefutable that BBakeries has invested considerable resources in developing its recipes, manufacturing processes and efficiency methodologies. (See Id. at ¶¶ 8, 13.) Such information has been compiled only over the course of many years, through great expense, time and effort. (Id.) See A.M. Skier Agency, 747 A. 2d at 941 (finding that client directory was a trade secret because it had been compiled over the course of many years through great time, expense and effort and therefore protected from misappropriation); Omicron Systems, Inc. v. Weiner, 860 A. 2d 554, 564 (Pa. Super Ct. 2004) (holding that language from proposals constituted trade secrets where the language was part of an overall project management methodology in the design of which the firm had invested much time and money). The trade secrets at issue here cannot be easily duplicated by legitimate means, as evidenced by, for example, Hostess's lack of success in the super premium market and the fact that, after seventy-five years of production, Thomas' English Muffins remain a unique product. (Babin Decl. at ¶ 21.)

      Indeed, Pennsylvania courts have declared that confidential information, relating to pricing and sales strategies, spending priorities, research and development plans and projects, the analysis of the marketplace and marketing strategies and the status of negotiations with customers all constitute confidential and proprietary trade secret information. See, e.g., Air Products, 442 A. 2d at 1122 (product technology, details of research and development, projected capital spending program, bidding procedures, status of negotiations, and analysis of market opportunities constituted protectable information because plaintiff invested significant time and expense to develop the information and because all appropriate employees signed agreements to prevent disclosure of the information); SI Handling Systems, 753 F.2d 1244 (applying Pennsylvania law) (finding that former employer was entitled to trade secret protection for

8

technical data regarding efficiency factors, calculations for systems design, formulae for systems design and the content of three pending patent applications).

       (ii) **Defendant's anticipated employment at Hostess would inevitably lead to the disclosure of Plaintiff's trade secrets.**

  Air Products, the leading case regarding the doctrine of inevitable disclosure in Pennsylvania, is strikingly similar to the case at hand in terms of the inevitability of the disclosure of the relevant trade secrets if Defendant is permitted to begin his new position without restriction. In Air Products, defendant Johnson, a former Vice President at Air Products, accepted employment with Liquid Air. 442 A. 2d at 1116-17. Although they were direct competitors and generally sold the same product, Air Products held a larger market share in "on-site" sales and Liquid Air in "merchant" sales." Id. at 1116. Air Products was concerned that Johnson would divulge trade secrets pertaining to the on-site gas sales, which Air Product had spent significant resources developing. Id. at 1116-17. The Air Products court found that even though Johnson did not "have detailed knowledge about Air Products' market opportunities or about the technological process involved in the on-site mode of delivery of industrial gas," he had enough overall knowledge of the progression and results of Air Products' research and field-testing to reduce the risk to Liquid Air in developing a similar project. Id. The court held that if Johnson were to work in Liquid Air's on-site business, he would inevitably disclose Air Product's trade secrets because "it would be impossible to perform his managerial functions in on-site work without drawing on the knowledge he possese[d] of Air Product's confidential information," (citing to the trial court opinion) and upheld the trial court's order enjoining Johnson from doing so. Id. at 1122.

  Here, based on the information available to Plaintiff to date, Botticella's position at Hostess appears to be substantially identical to his position at BBakeries, albeit in a different part

9

of the country. (See Babin Decl. at ¶¶ 4-14, 20, 21.) Botticella cannot realistically oversee the development of production methodologies for Hostess without drawing upon trade secrets learned during his employment at BBakeries. Similarly, an executive of his level in operations would inevitably be a party to discussions regarding competitive price bidding. His knowledge of BBU companies' cost and price structure would provide an unfair advantage to Hostess in their competitive markets.

Here, if Botticella is permitted to work for Hostess, BBakeries would "find[] itself in the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game." PepsiCo, Inc. v. Redmond, 54 F. 3d 1262, 1270 (7th Cir. 1995). Such a situation is untenable, and compels a finding that Plaintiff is likely to succeed on the merits. See Id.

Moreover, Botticella's deception in describing his post-termination plans for retirement and attempting to delete information from his company-issued laptop, and his continued access to trade secrets after making his decision to accept employment with Hostess, further establish Plaintiff's likely success on the merits. In PepsiCo, the Seventh Circuit found it persuasive to the issuance of an injunction "[defendant's] lack of forthrightness both in his activities before accepting his job with Quaker and in his testimony as factors leading the court to believe the threat of misappropriation was real." Id. at 1267; see also id. at 1270, 1271 (emphasizing lack of candor as basis for injunctive relief).

    **b.**  **Plaintiff is likely to prevail on its breach of contract claim.**

In addition to using and disclosing trade secrets in violation of the PUTSA, Botticella's employment by Hostess would inevitably lead to the disclosure of confidential information (including but not limited to trade secrets) encompassed in the Confidentiality Agreement signed by Botticella on March 13, 2009 as a condition of his continued employment by BBakeries. That

10

agreement provides that Botticella explicitly agreed "not to provide any assistance to any competitor of the Employer . . . that reasonably will involve the use or disclosure of any of Employer's Business Information or other information that is confidential or proprietary to Employer." (Babin Decl. Ex. A at ¶ 3.)[3]

Botticella's stated intent to begin work at Hostess on January 18, 2010 constitutes a repudiation of his obligations under the Confidentiality Agreement because, as explained above, his anticipated position at Hostess would require the inevitable disclosure of trade secrets and other confidential information.

The Confidentiality Agreement specifically provides that Plaintiff is entitled to an injunction under such circumstances:

> Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, Employer shall suffer irreparable injury for which there is no adequate remedy at law. Employer will therefore be entitled to injunctive relief from the courts without bond, enjoining Employee from engaging in activities in breach of this Agreement.

(Babin Decl. at Ex. A, ¶ 12.)

### 2. Plaintiff Will Suffer Irreparable Harm Without Injunctive Relief Because Defendant Will Inevitably Disclose Plaintiff's Trade Secrets And Confidential Information To Hostess.

"Irreparable harm" is harm that cannot be easily quantified or measured for the purpose of calculating post-facto monetary damages. See, e.g., National Business Services, Inc. v. Wright, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998) ("Harm is irreparable when it cannot be adequately compensated in damages, either because of the nature of the right that is injured, or because there exists no certain pecuniary standards for the measurement of damages.") (internal

---

[3] "Business Information" is broadly defined under the agreement to include all trade secrets under the Uniform Trade Secrets Act, as well as other confidential or proprietary information. (Babin Decl. Ex. A at ¶ 1.)

citations omitted). Here, Plaintiff will suffer irreparable harm by the disclosure of Plaintiff's trade secrets and confidential information because the harm of such disclosure will be impossible to measure after the fact. It would be nearly impossible to determine loss of market share by Plaintiff as a result of the competitive advantages Hostess would gain through knowledge of Plaintiff's product cost and marketing strategy. Likewise, there would be no practical way to determine the damage to Plaintiff if Hostess is able to reduce its costs of production, thereby lowering its prices or increasing its margins, by implementing Plaintiff's efficiency strategy. While the sales losses of caused by the entry of a product identical to one of Plaintiff's protected products might be easier to measure, it is unlikely that Hostess would copy Plaintiff's product precisely. Rather, Hostess would likely use Botticella's knowledge of Plaintiff's trade secrets to develop very similar, but slightly differentiated products, which could permanently erode Plaintiff's market share while making it difficult to determine precisely what portion of Hostess's sales are attributable to the misappropriated knowledge.

### 3. Defendant Will Not Suffer Any Irreparable Harm If Injunction Is Issued.

As discussed above, Plaintiff will suffer irreparable harm without the protection of injunctive relief. Were this Court to grant Plaintiff's request for relief, however, Defendant would suffer no legitimate injury. The issuance of an injunction would merely maintain the current status quo. Moreover, the Confidentiality Agreement specifically provides that Plaintiff is entitled to injunctive relief without bond in the event of "breach or threatened breach." Defendant, therefore, has no equitable claim to harm caused by an injunction issued in response to his actions which, at the very least, constitute a threatened breach of the Confidentiality Agreement.

### 4. A Preliminary Injunction Is In The Public Interest.

A preliminary injunction is in the public interest here because, without such injunctions, individuals would be free to flout confidentiality agreements and legal protections on the use of trade secrets with impunity. See Fisher Bioservices, Inc. v. Bilcare, Inc., No. 06-567, 2006 WL 1517382, at *21 (E.D. Pa. May 31, 2006) (granting injunctive relief will serve the public interest because it will "discourage . . . the wrongful use of confidential information and trade secrets . . .") (internal citations and quotations omitted). Thus, an injunction is necessary in this matter not only to prevent harm to Plaintiff, but also to prevent harm to similarly situated businesses.

### B. The Court Should Issue A Temporary Restraining Order To Prevent Immediate Irreparable Harm To Plaintiff Pending A Hearing On The Motion For A Preliminary Injunction

The standard for obtaining a TRO is very similar to the standard for obtaining a preliminary injunction:

> To obtain a temporary restraining order in this Circuit, the moving party has the burden of showing (a) a reasonable likelihood of success on the merits; (b) that it will suffer irreparable harm absent such relief and (c) that on balance the equities and the public interest favor such relief. See e.g. American Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136, 1140 (3d Cir. 1986) and cases cited therein.

Graphic Mgmt. Assoc., Inc. v. Honegger, No. 94-0825, 1994 WL 59369, at *1 (E.D. Pa. Feb. 25, 1994) (granting TRO). For all the reasons stated above, this standard has been met.

In addition, Plaintiff can demonstrate that irreparable harm will result if relief is delayed and that additional notice to defendants should not be required. See Fed. R. Civ. P. 65(b).

### 1. Irreparable Harm Will Result If Relief Is Delayed.

Botticella has conceded that he plans to begin work at Hostess on Monday, January 18, 2010. Once he does so, it will be impossible to restore the present status quo. Once Botticella begins divulging, directly or indirectly, Plaintiff's trade secrets and confidential information, no

13

court will be able to put the genie back in the bottle and erase Plaintiff's trade secrets from Hostess's institutional memory. It therefore is imperative that Plaintiff be given the opportunity to take discovery and determine the nature of Botticella's anticipated position *before* he begins work at Hostess. Simply put, today, there is the opportunity to prevent *any* harm from being done to Plaintiff. By Monday, it may be too late.

### 2. Additional Notice To Defendant Should Not Be Required.

Plaintiff just learned of Botticella's deception and intent to work for Hostess two days ago, on Wednesday, January 13, 2010. When confronted, Botticella was evasive and, upon his departure, he instructed his secretary to destroy potential evidence of his misconduct. (Babin Decl. at ¶ 19, 24.) As Botticella is planning to begin work at Hostess on Monday, January 18, 2010 (a federal holiday), today is the last opportunity Plaintiff has to obtain an injunction maintaining the status quo. Counsel for Plaintiff, Michael Banks, spoke with Defendant by telephone this morning and informed Defendant that Plaintiff intended to file the pending motions and seek a hearing. (See Certification of Counsel's Compliance.) Defendant stated that he would be contacting Hostess for guidance. (Id.) Approximately 30 minutes later, Defendant called Mr. Banks back and provided a cell phone number at which he can be reached this afternoon. (Id.) Further delay would irreparably prejudice Plaintiff. Therefore, Plaintiff seeks a temporary restraining order preserving the status quo just long enough for expedited discovery and a formal, noticed hearing on a preliminary injunction to take place. Under such circumstances, additional notice prior to the issuance of a temporary restraining order should not be required.

## IV. CONCLUSION

For all the reasons stated herein, Plaintiff respectfully requests that the Court issue a Temporary Restraining Order pursuant to Federal Rule of Civil Procedure 65(b) and, after notice

14

and a hearing, a Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65(a), each providing that: (1) Botticella is enjoined from commencing employment with Hostess; (2) Botticella is enjoined from disclosing trade secrets or other Business Information, as defined in the Confidentiality Agreement; (3) Botticella is ordered to return all confidential information obtained during the course of his employment with Plaintiff or its predecessors, except personal compensation and benefit information; (4) Botticella must preserve all evidence relevant to this action. Additionally, Plaintiff respectfully requests that the Court order the parties to engage in expedited discovery in order to facilitate the presentation of an appropriately developed record at the preliminary injunction hearing.

Dated: January 15, 2010

Respectfully submitted,

_/s/ Kasturi Sen_

Michael L. Banks
Victoria L. Gorokhovich
Kasturi Sen
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
215-963-5387/5642/5600
mbanks@morganlewis.com
vgorokhovich@morganlewis.com
ksen@morganlewis.com

Attorneys for Plaintiff
BIMBO BAKERIES USA, INC.

## CERTIFICATE OF SERVICE

I, hereby certify that on January 15th, 2010 I caused to be served a true and correct copy of the foregoing document by first class United States mail, postage prepaid, addressed as follows:

>Chris Botticella
>31721 Via Coyote
>Trabuco Canyon, CA   92679

_____
Kasturi Sen