UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BIMBO BAKERIES USA, INC.<br><br>　　　　Plaintiff,<br><br>　v.<br><br>CHRIS BOTTICELLA,<br><br>　　　　Defendant. | Civil Action No. _10 - CV - 194_ |

## DECLARATION OF DANIEL P. BABIN IN SUPPORT OF PLAINTIFF'S MOTIONS FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND OTHER RELIEF

I, Daniel P. Babin, hereby depose and say as follows:

1.　　　My name is Daniel P. Babin. I am Senior Vice President of Operations and Shared Services for Bimbo Bakeries business in the United States, my employer is Orograin Bakeries Manufacturing, Inc., a subsidiary of BBU, Inc., and I am authorized by Bimbo Bakeries USA, Inc. ("BBakeries")[1] to make this Declaration.

2.　　　BBakeries and its affiliates produce and distribute high-quality baked goods under many brand names, including, Entenmann's, Arnold, Oroweat, Mrs Baird's, Stroehmann, and Boboli.

3.　　　Chris Botticella ("Botticella") has been employed by BBakeries or its predecessors for approximately twenty years.

---

[1]　　Like Orograin Bakeries Manufacturing, Inc., BBakeries is a subsidiary of BBU, Inc. The companies of BBU, Inc. are commonly referred to as Bimbo Bakeries USA.

4.      Currently, Botticella is the Vice President of Operations for BBakeries' Western Region. In that capacity, he has direct responsibility for five production facilities and also oversees "co-packers"[2] operations within his region.

5.      Through his employment, Botticella has acquired the knowledge necessary to produce many of BBakeries' products, often without reference to any written recipes or instructions, including but not limited to Thomas' English Muffins, Thomas' Bagels, all Oroweat bread products, Arnold and Oroweat Sandwich Thins, and Entenmanns's cake products. Botticella's knowledge includes recipes for these and other products. Botticella also knows the product specifications. For example, the weight of each dough piece, the bake profile of the products, the necessary acidity and other production standards not known to the public.

6.      For example, Botticella is one of less than ten people in the world with full knowledge of how to produce Thomas' English Muffins. Thomas' English Muffins are a unique product, famous for their distinctive "nooks and crannies" characteristics. BBU and its predecessors have gone to great lengths to keep secret the recipe and process for making Thomas' English Muffins for over seventy-five years. As a result of his employment, Botticella learned trade secrets relating to the production of the Thomas' English Muffins, including not only its recipe, but also the equipment necessary for its production, the necessary moisture level, and the way the product is baked which all contribute to its distinctive characteristics. With that knowledge, Botticella could produce an English Muffin that might look a bit different, but that would nevertheless possess the distinctive taste, texture and flavor character that distinguish the Thomas' English Muffin and that have been the foundation of the product's success.

---

[2]      Co-packers are contract manufacturers. They are bakeries not owned by BBU or its affiliates, but produce BBU branded products pursuant to a contractual relationship.

7.      As a result of corporate acquisitions and reorganizations, responsibility for a facility in Placentia, California that produces Thomas' English Muffins came under Botticella's supervision after January 21, 2009.[3]  As a result, Botticella was required to execute a Confidentiality, Non-Solicitation and Invention Assignment Agreement ("Confidentiality Agreement") and he did so March 13, 2009 (a true and complete copy of which is attached hereto as Exhibit A).  Execution of the Confidentiality Agreement was a condition of his continued employment, because without such an agreement he would not have been permitted or able to perform his responsibilities, which included the supervision of the Placentia facility.

8.      Similarly, Botticella has full knowledge necessary to produce Sandwich Thins, a new product marketed under the Arnold and Oroweat brands.  Sandwich Thins are rolls that are used for making sandwiches, and they contain just 100 calories per serving.  They are a new product category and have been wildly popular since their introduction in 2009.  It was extremely challenging to develop a high quality product that tastes good, is substantial enough to support a hearty deli-style sandwich, and contains only 100 calories per serving.  At least $18 Million was spent on research and development, bakery equipment and marketing the new product.

9.      By way of further example, many of BBakeries competitors, including, upon information and belief, Hostess Bakeries, rely heavily on premixed ingredients in the production of baked goods.  BBakeries and its affiliates use almost no premixed ingredients, instead buying raw ingredients separately at significant cost savings.  As a result of his employment with BBakeries, Botticella possesses the confidential know-how regarding the large scale production of baked goods from such separate ingredients, rather than premixed ingredients.

---

[3]      On January 21, 2009 George Weston Bakeries, whose brands included Thomas' was sold to BBU, Inc..

10.     These production trade secrets are closely guarded through the use of confidentiality agreements and limitations on access to knowledge.  In general, such information is provided on a need-to-know basis, so that most employees possess information only directly relevant to their assigned task, and very few employees, such as Botticella, possess all of the knowledge necessary to produce a finished product.

11.     In addition to trade secrets relating directly to production, Botticella has been privy to trade secrets and confidential information relating to every aspect of BBakeries' and its affiliates' business.

12.     For example, Botticella knows highly confidential strategic information regarding which plants and lines will be closed and where expansions are planned over the next several years.  He is also privy to ongoing, highly confidential negotiations for a new plant that the company expects to open in the United States.  Likewise, Botticella has very sensitive knowledge regarding specific expansion plans in California.

13.     I have spent a great deal of time teaching Botticella efficiency techniques that I developed over many years at George Weston Bakeries and its predecessor.  Botticella came under my indirect supervision subsequent to George Weston Bakeries acquisition by BBU, Inc.  The particular strategies that I developed and implemented at George Weston are highly confidential trade secrets and are expected to result in approximately tens of millions of dollars in reduced costs for BBakeries.  These strategies include complex interwoven labor management techniques and proprietary and confidential unique baking equipment sequencing techniques, the combination of which reduces costs significantly.  Knowledge of these efficiency strategies would be highly valuable to BBakeries' competitors, as they are unique to BBakeries and its affiliates and provide a significant competitive advantage.

14. Botticella is also privy to highly sensitive and confidential cost structure trade secrets regarding most, if not all, of BBakeries products. Botticella was also privy to pricing, promotion and customer strategies for the sale BBakeries products. If a competitor were to know BBakeries precise costs for production, and/or promotional and customer strategies as Botticella does, it would have a substantial and unfair advantage in setting prices and bidding for contracts.

15. On January 4, 2010, Botticella submitted notice of his resignation, with an announced separation date of January 15, 2010. Botticella informed his direct superior that he was retiring.

16. Attached hereto as Exhibit B is a true and correct copy of an e-mail sent by Botticella announcing his departure and referencing his need for COBRA benefits. The e-mail, coupled with statements by Botticella, led those of us in senior management to believe that Botticella was retiring, rather than accepting employment with a direct competitor.

17. Based on the belief that Botticella was retiring from work completely, Botticella was permitted to continue working during his two-week notice period and his transition was generally informal, as we expected that he could be contacted as needed if questions arose after his departure. Moreover, we allowed him continued access to BBakeries' most sensitive information, both in the form of emails and participation in meetings. For example, on January 6, 2010, Botticella was e-mailed highly confidential information regarding pricing strategy for a competitive proposal to a major national retailer. Under no circumstances would he have been allowed to continue to receive such highly confidential information had senior management known that he was going to work for a competitor.

18. On January 13, 2010, we began to hear rumors among senior management that Botticella was not, in fact, retiring and instead planned to go to work for one of BBU's major

competitors, Hostess Brands, Inc. ("Hostess").[4]  To the best of my knowledge, prior to January

13, 2010 no members of the senior management of BBU or any of its affiliates knew or

suspected that Botticella planned to go to work at Hostess, and Botticella had certainly given us

no indication that this was his plan.

19.     When confronted by senior management on January 13, 2010, after initially trying

to avoid disclosing the truth, Botticella admitted that he had accepted a job with Hostess, and

planned to begin work at Hostess on January 18, 2010.

20.     Upon information and belief, Botticella's anticipated job title at Hostess is Vice

President Bakery Operations – East, and the duties of that position include responsibility for

bakery cost performance, quality, and staff development in the eastern region.  Those duties will

inevitably require Botticella to draw on trade secrets learned during the course of his

employment at BBakeries, as described above.

21.     For example, Botticella's responsibilities at BBakeries included the development

and production of super premium breads, such as those marketed under the Oroweat and Arnold

brand names.  Such breads are very difficult to produce in a cost effective manner, and

BBakeries has perfected production techniques that allow it to earn relatively high margins on

these super premium products.  Upon information and belief, Hostess has been attempting for

years to break into the super premium bread market without success.  For example, Hostess

attempted to enter this market in 2004 (see press release, "Four Hearty New Varieties of Baker's

Inn Bread Debut in Stores," attached as Exhibit C) with its Baker's Inn line of products, which it

subsequently discontinued.  In February 2009, Hostess again tried to enter this market with the

---

[4]        Hostess Brands, Inc. produces and distributes baked goods under many different brand names, including
Hostess, Wonder, Home Pride, Dolly, Nature's Pride, Eddy's, Sweetheart, Drake's, Merita, Butternut, Beefsteak,
Cotton's Holsum, J.J. Nissen, Millbrook, and Bread du Jour.

introduction of its Nature's Pride branded bread (see press release, "Natures Pride Bread Debuts as First 100% Natural Line of Bread to be Offered Across the Country," attached as Exhibit D). Upon information and belief, this launch has been met with limited success in the market. Botticella's knowledge of trade secrets relating to BBakeries' highly successful and profitable super premium breads would be invaluable to Hostess in its attempts to develop a successful product.

22.     Not only did Botticella deceive management about his post-departure plans, but he continued to avail himself of confidential information and trade secrets after he announced his departure without disclosing his conflict of interest.

23.     In particular, during the period from January 4, 2010 to January 13, 2010, Botticella participated in numerous meetings where confidential information and trade secrets were discussed and revealed without divulging his plans to work for Hostess. For example, on January 7, 2010, Botticella participated in a meeting where specific strategies were discussed for competing with Hostess in the snack-cake market. Botticella not only failed to disclose his post-departure plans, he stayed in the room and made no effort to excuse himself when it became apparent that he was acquiring competitive information directly relevant to his soon-to-be employer.

24.     Botticella's lack of forthrightness was not limited to his acquisition of confidential information and trade secrets and lack of disclosure about his position at Hostess. When a Human Resources manager asked Botticella's secretary for his computer on January 14, 2010, Botticella's secretary stated that she could not turn over the computer because Botticella had left instructions for her to delete the contents of the computer before turning it in, and she had not yet done so. Although the computer was retrieved by the company without the

instructed deletion occurring, we do not yet know what confidential information and trade secrets may have been removed and taken by Botticella in the time leading up to his departure.

25.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct based on my personal knowledge, information and belief.

Executed on January 15, 2010

Daniel P. Babin

# EXHIBIT A

## CONFIDENTIALITY, NON-SOLICITATION AND INVENTION ASSIGNMENT AGREEMENT

THIS CONFIDENTIALITY, NON-SOLICIATION AND INVENTION ASSIGNMENT AGREEMENT (the "Agreement") is made this _13_ day of _MARCH_____, 2009, by and between BBU, Inc., on behalf of itself and its affiliates and subsidiaries (hereinafter referred to as "BBU") and _C BOTTICELLA_ (hereinafter referred to as "Employee"). This Agreement shall apply to your employment with BBU and any future employment with any of BBU's current or future subsidiaries, affiliates, successors or assigns (collectively hereinafter referred to as "Employer").

In consideration for Employee's access to Employer's Business Information (as defined below), Employee's initial and/or continued at-will employment, Employee's receipt of salary and other remuneration and benefits associated with that at-will employment, the parties agree:

    1.    Purpose For Non-Solicitation Protections.  Employee agrees that Employer is engaged in highly competitive businesses. Employer's involvement in these businesses has required and continues to require the expenditure of substantial amounts of money and the use of skills developed over long periods of time. As a result of these investments of money, skill and time, Employer has developed and will continue to develop certain valuable trade secrets and confidential and proprietary business information that are unique to Employer's businesses and the disclosure of which would cause Employer great and irreparable harm. These investments also give Employer a competitive advantage over companies that have not made comparable investments, and that otherwise have not been as successful as Employer in developing their businesses. Solely by virtue of Employee's employment with Employer, Employee will become privy to Employer's trade secrets (as defined by the Uniform Trade Secrets Act, as adopted by the legislature of the State of California, as the same may be amended from time to time) and other confidential or proprietary information including, without limitation, certain information and "know-how" related to the process of manufacturing Thomas'® brand products, business plans and strategies, new product ideas, new packaging ideas, customer information, pricing strategies, research and development and manufacturing and distribution processes and systems, whether in written, electronic or machine readable form (collectively referred to as "Business Information"). For the avoidance of doubt, for purposes of this Agreement, all BBU trade secrets are expressly included within the definition of Business Information. Employer's agreement to provide Employee with access to the Business Information is made in exchange for Employee's agreement to the restrictions and obligations set forth herein. It would be unfair for Employee to use the Business Information for the benefit of a person or entity other than Employer.

    2.    Non-Competition While Employed.  Employee agrees that during the term of Employee's employment with Employer, Employee will not, directly or indirectly, individually or through an entity, as an owner, part owner, partner, officer, director, consultant, employee, agent, representative or otherwise, own, advise, manage, operate, join, control, receive compensation or benefits from, be employed by or render services to any person or entity which, directly or indirectly, is competitive with any product or service offered or sold by Employer as conducted or planned by Employer during my employment.

3.    Prohibition On Use Or Disclosure of Business Information and Return of Same. Employee will not directly or indirectly use or disclose any of Employer's Business Information or other information that is confidential or proprietary to Employer without Employer's prior written consent either during Employee's employment with Employer or after the cessation, for any reason, of Employee's employment with Employer.  Without limiting the generality of the foregoing, Employee agrees not to provide any assistance to any competitor of Employer, including, without limitation, any competing business started or founded by Employee that reasonably will involve the use or disclosure of any of Employer's Business Information or other information that is confidential or proprietary to Employer.  Employee agrees that at the end of employment with Employer for any reason, and whenever otherwise asked to by Employer, Employee will return to Employer all property in Employee's possession, custody or control that he or she obtained or had access to during Employee's employment.  This obligation extends, without limitation, to property obtained from Employer, prospective and actual customers of Employer, prospective and actual suppliers of Employer and other third parties and their respective employees, agents and representatives.  The obligation to return property extends, without limitation, to documents, whether in written or electronic form, and whether or not they contain Business Information and all Employer property such as computers, electronic communication devices (e.g. cellular phones and Blackberry devices), automobiles, keys and access cards.  With respect to documents, Employee understands and agrees that this obligation requires the return of every document received during and as a result of employment with Employer, other than paystubs and benefit plan booklets.

4.    Non-Solicitation Of Employees.  Employee agrees that the knowledge and identities of Employer's employees, as well as their strengths, skills and acumen, constitutes trade secret information. Employee further agrees that while employed by Employer and for two (2) years after the conclusion of Employee's employment with Employer for any reason, Employee will not directly or indirectly recruit, hire or attempt to recruit or hire any other employee of Employer with whom Employee had contact during employment with Employer.  For the purposes of this paragraph, "contact" means any interaction whatsoever between Employee and the other employee.

5.    Non-Solicitation Of Customers.  Employee agrees that while employed by Employer and for two (2) years after the conclusion of Employee's employment with Employer for any reason, Employee will not use or disclosure any Business Information to, or attempt to, directly or indirectly solicit, divert, or take away, any customers, business or suppliers of Employer whom Employee serviced, called upon or solicited during his or her employment, or with whom Employee become acquainted as a result of his or her employment with Employer.

6.    Employer's Ownership of Inventions, Ideas and Concepts

a.    Employee acknowledge that Employer is entitled to all inventions, ideas and concepts which Employee may conceive or execute, either alone or with others, during the period of my employment with Employer, and which are related to Employer's business or interest or which result from tasks assigned to me by Employer (herein collectively "Inventions"). Employee hereby assigns all my right, title and interest in any such Inventions to Employer or to any other party designated by Employer.

2

b.    Employee will immediately disclose to Employer any and all Inventions.

c.    Employee will execute any assignments, applications or other documents which Employer may consider necessary to vest title to the Inventions in Employer, obtain patents, trademarks, copyrights or other legal rights for said Inventions, and take any other action necessary to protect Employer's interest in such Inventions.

d.    Employee understands that nothing in this Paragraph 6 applies to inventions, ideas or concepts that Employee develops entirely on his or her own time without using Employer's equipment, supplies, facilities, or trade secret information except for those inventions, concepts or ideas that either: (1) relate at the time of conception or reduction to practice of the invention, concept or idea to Employer's business, or actual or demonstrably anticipated research or development of Employer; or (2) result from any work performed by Employee for Employer.

7.    Prior Inventions. Employee does not have any rights to any inventions made prior to my employment except those listed on the signed attachment to this Agreement (if any).

8.    Waiver Of Breach. Employer's waiver of a breach of any provision of this Agreement by Employee does not waive any subsequent breach by Employee, nor does Employer's failure to take action against any other employee for similar breaches operate as a waiver by Employer of a breach.

9.    Tolling. In the event that Employee violates any of the provisions of this Agreement, the obligations contained in those provisions will run from the date on which Employee ceased to be in violation of any such provision.

10.    Severability. If any provision in this Agreement is determined to be in violation of any law, rule or regulation or otherwise unenforceable, and cannot be modified to be enforceable, such determination shall not affect the validity of any other provision of this Agreement, and such other provisions shall remain in full force and effect. Each provision, paragraph and subparagraph of this Agreement is severable from every other provision, paragraph and subparagraph and constitutes a separate and distinct covenant. This Agreement supersedes any previous agreements with Employer on these subjects except that the provisions of any such agreement shall be substituted for any of those held to be unenforceable in this Agreement. In the event that any article, section, term, clause or provision of this Agreement is determined to be invalid, illegal or unenforceable for any reason, any such article, section, term, clause or provision shall be deemed to be automatically revised to the least extent necessary to make any such article, section, term, clause or provision valid, legal or enforceable as the case may be.

11.    Successors. This Agreement shall be binding upon and inure to the benefit of Employer and its successors and assigns, and may be enforced by any one or more of same, without need of any further authorization or agreement from me. Employer shall have the right to assign, and Employee hereby consents to the assignment of, this Agreement to a successor to all or substantially all of the business or assets of Employer or any subsidiary or affiliated corporation of Employer by which Employee may be subsequently employed.

3

12.    Injunctive Relief. Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, Employer shall suffer irreparable injury for which there is no adequate remedy at law. Employer will therefore be entitled to injunctive relief from the courts without bond, enjoining Employee from engaging in activities in breach of this Agreement.

13.    Notification To Other Parties. If Employee's employment terminates for any reason, Employee agrees to provide a copy of this Agreement, and consents to Employer's providing a copy of this Agreement, to any subsequent employer or potential employer of Employee, or other interested party.

14.    Entire Agreement And Modification. This Agreement constitutes all agreements and understandings between Employer and Employee concerning the subject matters contained therein. This Agreement supersedes any and all prior understandings and agreements between the parties concerning these subject matters. This Agreement shall not be modified, terminated, waived, altered or amended except in writing, signed by Employee and a duly authorized officer of Employer.

15.    **CHOICE OF LAW; EXCLUSIVE VENUE, WAIVER OF JURY TRIAL. THE PARTIES AGREE THAT THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, WITHOUT REGARD TO ITS CONFLICT OF LAWS PRINCIPLES. ANY CLAIMS OR CAUSES OF ACTION WHICH ARISE OUT OF THIS AGREEMENT SHALL BE INSTITUTED AND LITIGATED ONLY IN A STATE COURT LOCATED WITHIN MONTGOMERY COUNTY, PENNSYLVANIA OR A FEDERAL COURT IN OR NEAR MONTGOMERY COUNTY, PENNSYLVANIA. EMPLOYEE HEREBY CONSENTS TO THE JURISDICTION OF THE STATE COURTS LOCATED WITHIN MONTGOMERY COUNTY, PENNSYLVANIA OR A FEDERAL COURT IN OR NEAR MONTGOMERY COUNTY, PENNSYLVANIA. FOR THE RESOLUTION OF ANY DISPUTE REGARDING OR ARISING OUT OF THIS AGREEMENT.** Employer and Employee further acknowledge and agree that this Agreement is intended, among other things, to supplement, as applicable, the common law of trade secrets and the provisions of the Uniform Trade Secrets Act, as amended from time to time, and the duties Employee owes to Employer under the common law, including but not limited to, the duty of loyalty, and does not in any way abrogate any of the obligations or duties Employee otherwise owes to Employer. **I STIPULATE AND CONSENT THAT THE STATE COURTS LOCATED WITHIN MONTGOMERY COUNTY, PENNSYLVANIA AND THE FEDERAL COURT IN OR NEAR MONTGOMERY COUNTY, PENNSYLVANIA HAVE PERSONAL JURISDICTION OVER ME, AND WAIVE MY RIGHT TO OBJECT TO ANY SUCH COURT'S JURISDICTION OVER ME OR ANY LEGAL ACTION ARISING HEREUNDER. THE PARTIES HEREBY WAIVE THEIR RIGHT TO JURY TRIAL ON ANY LEGAL DISPUTE ARISING FROM OR RELATING TO THIS AGREEMENT, AND CONSENT TO THE SUBMISSION OF ALL ISSUES OF FACT AND LAW ARISING FROM THIS AGREEMENT TO THE JUDGE OF A COURT OF COMPETENT JURISDICTION AS PROVIDED FOR ABOVE.**

16.   <u>EMPLOYMENT AT WILL</u>. THIS AGREEMENT DOES NOT GUARANTEE CONTINUATION OF EMPLOYMENT FOR ANY PERIOD AFTER THE DATE IT IS EXECUTED; EMPLOYEE RESERVES THE RIGHT TO TERMINATE EMPLOYEE'S EMPLOYMENT AT ANY TIME FOR ANY REASON OR NO REASON; AND EMPLOYER RESERVES THE RIGHT TO TERMINATE EMPLOYEE'S EMPLOYMENT AT ANY TIME FOR ANY REASON OR NO REASON.

THE PARTIES ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THIS AGREEMENT, THAT THEY HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, AND THAT THEY ENTER INTO THIS AGREEMENT FREELY AND VOLUNTARILY.

IN WITNESS WHEREOF, the parties hereto knowingly and voluntarily execute this Agreement as of the date set forth below:

EMPLOYEE

_____          Dated: 3 - 13 - 09.
[employee's name]


EMPLOYER
BBU, Inc., on behalf of itself and its subsidiaries and affiliates

By: _____       Dated: 4/2/09
[name]
[title]

33339_2

5

# EXHIBIT B

| | | |
|---|---|---|
| **Chris Botticella/MBB/US** | To | Joe Dangelmaier/Office/TRGP/MBB/US@MBB |
| 01/04/2010 12:21 PM | cc | |
| | bcc | |
| | Subject | Resignation notice. |

History:          ♫ This message has been replied to.

Joe:

As per our discussion this morning I am planning to leave the company on Jan 15-2010.

It has been a great journey for the past 7+ years.  You and I had our differences ,but at the end we always agreed on what the correct decision was for the Company.

I have accumulated 11 weeks of vacations over the years, this information was send to Gail in Dec 10-09.

Joe, I am OK with a total payment on Jan 15-10. or continue to get paid by weekly for the next 11 weeks . It is important for me to know which method the company chooses ASAP because I need to enroll in to the Cobra Medical Plan.

For the company car I would like to keep it,and pay the current blue book value,the car is 2 years old and has 46121miles.

Again Thanks for keeping up with me for " SO LONG."

CB.


Chris Botticella


This e-mail, including attachments, may include confidential and/or proprietary information, and may be used only by the person or entity to which it is addressed.  If the reader of this e-mail is not the intended recipient or his or her authorized agent, the reader is hereby notified that any dissemination, distribution or copying of this e-mail is prohibited.  If you have received this e-mail in error, please notify the sender by replying to this message and delete this e-mail immediately.

# EXHIBIT C





Visit our Brands     Hostess Cakes     Go

BRANDS

ABOUT US

MEDIA

CONTACT US

CAREERS

**MEDIA**

| | |
|---|---|
| **From:** | **Hostess Brands, Inc.** |
| **Contact:** | **Hannah Arnold, 212-575-4545** |
| | **Linden Alschuler & Kaplan, Inc. Public Relations** |

For Immediate Release

**FOUR HEARTY NEW VARIETIES OF BAKER'S INN ™ BREAD DEBUT IN STORES**

*New Brand of Super Premium Bread Called a Top 10 "Brand to Watch" After Highly Successful Launch in 2004*

Four new hearty varieties of Baker's Inn ™ bread have begun debuting in retail stores, following the highly successful launch of the super premium brand last year, according to Bob Morgan, executive vice president of sales and trade marketing at Hostess Brands.

Nine Grain, Stone Ground Whole Wheat with Extra Fiber, Crunchy Honey Oat, and Cinnamon Wheat join initial varieties 100% Whole Wheat, Honey Whole Wheat, Harvest MultiGrain, Raisin Wheat, Seven Grain, Honey White and Hearty Potato with Grain to give consumers 11 wholesome choices to chew on.

With outstanding consumer feedback and strong sales, Baker's Inn was named a top 10 "brand to watch" by Information Resources, Inc. in its recent "New Product Pacesetters" report. To qualify as a pacesetter, brands must achieve a certain sales threshold in the food, drug and mass channels (excluding Wal-Mart) in their first year. Less than one quarter of new brands or brand extensions introduced in 2003-2004 reached that threshold, according to IRI.

"The impressive debut of Baker's Inn reflects consumers' general interest in healthy eating as well as the specific aspects of our product, including great taste and corner bakery-style packaging, that have made it an absolute stand-out in a competitive category," said Morgan. "What's particularly gratifying, however, is that Baker's Inn has achieved this level of success as an entirely new brand. Nearly all of the other 'pacesetters' recognized by IRI are brand extensions."

Hostess Brands is the nation's largest wholesale baker and distributor of fresh baked bread and sweet goods, under various brand names, including Wonder®, Hostess®, Dolly Madison®, Baker's Inn®, Home Pride®, Merita® and Drake's®.

### #

PRIVACY POLICY    |    HELP    |    TERMS AND CONDITIONS

© Copyright 2005 Hostess Brands - All rights reserved.

# EXHIBIT D





Visit our Brands   Hostess Cakes   Go

**BRANDS**

**ABOUT US**

**MEDIA**

**CONTACT US**

**CAREERS**

**MEDIA**

| | |
|---|---|
| From: | **Hostess Brands, Inc.** |
| Contact: | **Hannah Arnold, 212-575-4545** |
| | **Linden Alschuler & Kaplan, Inc. Public Relations** |

For Immediate Release

## NATURE'S PRIDE™ BREAD DEBUTS AS FIRST 100% NATURAL LINE OF BREAD TO BE OFFERED ACROSS THE COUNTRY

Kansas City, MO – February 9, 2009 – Hostess Brands (IBC), one of the nation's largest wholesale bakers and distributors of fresh baked bread and sweet goods including iconic brand names such as Wonder® and Hostess®, has introduced Nature's Pride™ - the first 100% natural brand of breads available across the country - offering the promise that every single slice of Nature's Pride bread is baked without artificial flavors or colors, no high fructose corn syrup, no trans fats and no artificial preservatives.

The launch of Nature's Pride is a significant milestone for IBC – marking the first post-bankruptcy emergence product launch as well as the first complete line of bread products to be introduced in several years.

"The popularity of natural food products continues to increase as more and more consumers look for wholesome and healthy foods that they can feel good about feeding their families," said Stan Osman, Vice President of Marketing for Interstate Bakeries Corp., bakers of Nature's Pride. "Nature's Pride promises to deliver what these consumers want – a 100% natural brand of healthy, great tasting breads. Consumers can be sure that if the label says Nature's Pride it must be 100% natural."

"As the first 100% natural brand of bread to be offered across the country, we are confident that Nature's Pride will be one of the most significant brand launches in years, not only for IBC, but for the bread industry as a whole," said Rich Seban, Chief Marketing Officer for Interstate Bakeries Corp. "We are excited to launch this brand as we look forward to a new chapter of success for IBC."

An increasing number of consumers are adopting a "natural lifestyle" with a focus on health and well being that includes green living, sustainability and natural products as well as a heightened concern for the environment. As a

result, consumer interest in natural foods continues to grow with sales of natural foods and beverages increasing 50 percent over the past four years and total sales in 2008 exceeding $15 billion as consumers look for natural product options in all aisles of the grocery store (Mintel, December 2008).

Available today, the Nature's Pride line of bread products offers a menu of natural bread options including both hearty and traditional bread varieties that will address the preferences of all bread consumers.

The Nature's Pride product line includes:

- **Premium Hearty Breads (24 oz)** – 100% Whole Wheat, 12-Grain, Healthy Multi-Grain, Country White. Double Fiber, Stone Ground Whole Wheat with Honey, Country Potato and Butter Milk varieties are available in select markets.
- **Traditional Soft Breads (20 oz)** – 100% Whole Wheat, Honey Wheat

The Nature's Pride launch will be supported by a national advertising campaign which touts the brand's 100% natural goodness and great taste with the Nature's Pride promise – "Nothing less than 100%". The campaign, created by Grey NY, includes national television, print and online advertising and features top women's magazines like *Cooking Light, Everyday with Rachael Ray and Shape.*

Hostess Brands, the maker of Hostess products, is one of the nation's largest wholesale bakers and distributors of fresh baked bread and sweet goods under various brand names including Wonder®, Hostess®, Nature's Pride™, Dolly Madison®, Home Pride®, Merita® and Drake's®. For more information visit www.interstatebakeriescorp.com.

# # #

PRIVACY POLICY    |    HELP    |    TERMS AND CONDITIONS

© Copyright 2006 Hostess Brands - All rights reserved.