IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BIMBO BAKERIES USA, INC.,          :
                                   :          CIVIL ACTION
        v.                         :
                                   :          No. 10-0194
CHRIS BOTTICELLA                   :

SURRICK, J.                                        FEBRUARY <u>9</u>, 2010

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Presently before the Court is Plaintiff's Motion for Temporary and Preliminary Injunction

and Other Relief.  (Doc. No. 2.)  On January 19, 2010, after a conference with counsel and with

the agreement of counsel, a Consent Order was entered, enjoining Defendant from becoming

employed by Hostess Brands, Inc. ("Hostess") and from divulging any trade secrets or proprietary

or confidential information to Hostess, pending a preliminary injunction hearing scheduled for

January 25, 2010.  (Doc. No. 5.)  On January 25, 2010, after expedited discovery, the preliminary

injunction hearing was held.  At the conclusion of the hearing, the parties were given the

opportunity to submit proposed findings of fact and conclusions of law.  On February 3, 2010,

we heard oral argument.  The matter is now ripe for disposition.

I.      FINDINGS OF FACT

Based upon the pleadings, the evidence and testimony offered at the hearing, and the full

record, we make the following Findings of Fact:[1]

        1.      Bimbo Bakeries USA, Inc. ("Bimbo"), is one of the four largest companies in the

---

[1] These Findings of Fact reflect our credibility determinations regarding the testimony and evidence presented, as more fully discussed with respect to specific findings.  Credibility determinations are within the sole province of the Court, as the finder of fact.  Fed. R. Civ. P. 52; *see Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982).

baking industry. (Prelim. Inj. Hr'g Tr. 66-67, Jan. 25, 2010.)[2]  It is a Delaware

corporation with its principal place of business in the Commonwealth of

Pennsylvania. (Compl. ¶ 4.)

2.    Defendant Chris Botticella was, until January 13, 2010, Bimbo's Vice President

of Operations for California. (Hr'g Tr. 68.) Defendant is a citizen of California.

(Compl. ¶ 5.)

3.    Bimbo's operations in the United States are divided into the Western and Eastern

regions. (Hr'g Tr. 68.) Defendant was one of five key operations executives for

Bimbo in the Western region. Of the five, Defendant had the most experience

with both baking and business operations. (*Id.* at 77-78.)

4.    In his high-level position, Defendant had knowledge of and access to a variety of

confidential and proprietary information at Bimbo. (*Id.* at 73-75.) For example,

he was one of a limited number of people with clearance to access Bimbo's highly

proprietary and compartmentalized information, such as code books, which

contain the formulas and process parameters for Bimbo's products. (*Id.* at 73-75.)

5.    On March 13, 2009, as a condition of his employment at Bimbo, Defendant

signed a Confidentiality, Non-Solicitation, and Invention Assignment Agreement

("Confidentiality Agreement"). (Ex. 8.)

6.    On or about September 28, 2009, Defendant received an employment offer from

Interstate Brands Corporation ("IBC"), for the position of Vice President Bakery

---

[2] The transcript of the January 25, 2010, preliminary injunction hearing includes
Plaintiff's confidential information and was therefore filed under seal. (Doc. No. 13.)

Operations, East.  (Ex. 3; Botticella Dep. 71.)[3]  In that position, Defendant would report to the Senior Vice President for Bakery Operations.  (Ex. 3.)  Defendant's salary would be $200,000 plus stock options and up to a 25% bonus.  (*Id.*)  The $200,000 was a $50,000 pay cut from his salary at Bimbo; however, he was also to receive a $50,000 signing bonus.  (Hr'g Tr. 134; Ex. 3.)

7.    In addition, Defendant accrued eleven weeks of vacation time while at Bimbo, which would be paid out to him in the form of income upon his departure from Bimbo.  (Ex. 4.)

8.    Defendant accepted the offer with IBC on or around October 15, 2009.  (Ex. 3; Botticella Dep. 78.)

9.    IBC is the predecessor company to Hostess Brands, Inc. ("Hostess").  (Hr'g Tr. 60.)  Hostess is one of Bimbo's three major competitors.  (*Id.* at 66-67.)

10.    On December 7, 2009, Defendant signed an "Acknowledgment and Representation Form," in which he states that Hostess is not interested in Bimbo's trade secrets and that he will not disclose Bimbo's proprietary and confidential information to Hostess.  He also acknowledges that Hostess instructed him not to disclose or use in the course of his employment any confidential or proprietary information belonging to a previous employer.  (Ex. 7.)

11.    Defendant's resignation from Bimbo was to occur on January 15, 2010.  (Ex. 4.)  Defendant did not provide Bimbo with any notice of his intention to resign until

---

[3] Video excerpts of Defendant's deposition were presented as evidence by Plaintiff in the preliminary injunction hearing.

January 4, 2010. (*Id.*; Botticella Dep. 104-105.)  At that time, he did not inform anyone at Bimbo that he was taking another job or that he was going to work at Bimbo's competitor Hostess.  (Botticella Dep. 104-105.)  In fact, Defendant did not inform anyone at Bimbo that he was going to work at Hostess until January 13, 2010.  (*Id.* at 106.)

12.    At about 10 a.m. on January 13, 2010, Defendant told Bimbo's Vice President of Human Resources that he was leaving Bimbo to work at Hostess.  (*Id.* at 113-15.) Defendant finally disclosed this information because he found out that Bimbo executives had just learned about it from a Hostess announcement about his hiring.  (*Id.* at 114-15.)

13.    When Bimbo executives found out that Defendant was going to work for Hostess, he was told to stop working and leave that same day.  (*Id.* at 116-17.)  Defendant was not surprised, since he "absolutely" expected to be ushered out of Bimbo as soon as his intention to work at Hostess became known.  (*Id.*)

14.    As Bimbo's Vice President of Operations for California, Defendant was responsible for various areas of operations in California, including control over product quality and cost, labor issues, new product development, co-packer[4] launches, and product cost improvement.  (*Id.* at 68.)  He also worked closely with sales staff on sales promotions and capacity planning and estimation.  (*Id.*)

15.    Although Defendant's responsibilities were for Bimbo's operations in California,

---

[4] "Co-packers" are third-party companies that produce products for Bimbo.  (Hr'g Tr. 89.) Confidentiality between Bimbo and its co-packers is controlled by means of secrecy agreements and other measures.  (*Id.*)

his access to and knowledge of Bimbo's confidential information was national in scope. (*Id.* at 76-77.)

16.    As a member of Bimbo's senior staff, Defendant was involved with financial, strategic, sales, and product development issues at a company-wide level. (*Id.* at 69-71.) He was one of a small group of people, including Bimbo's President and CEO, its Senior Vice President of Operations and Strategic Services, its Senior Marketing Officer, and several high-level local executives, to participate in quarterly meetings regarding strategic planning for Bimbo. (*Id.* at 71.)

17.    Defendant was one of less than 12 people who had access to the "code books" that contain the formulas and process parameters for Bimbo's products. (*Id.* at 74-75.) The code books contain various scientific measurements that would allow the replication of Bimbo's products. (*Id.* at 75.) The code books are stored on a protected website, which has multiple layers of security, including access control and traceability of who has accessed it. (*Id.* at 75-76.) While some Bimbo employees had access to certain information needed for their jobs, like a formula for a specific product, very few people had the access that Defendant had to this entire range of information. (*Id.* at 76.)

18.    Defendant was one of the key Bimbo employees responsible for implementing a new strategy in the Western region intended to increase profitability by $100 million in the course of 2009. (*Id.* at 73-74, 92-93.) The actual implementation of this strategy resulted in cost savings of $75 million, with Defendant responsible for close to half of that amount. (*Id.* at 90-91.) That strategy was developed by

5

Bimbo in the Eastern region between 2001 and 2008. (*Id.* at 92-93.) It includes a quality system invented by Bimbo, called "Integrated Process Management." (*Id.* ay 90-91.)

19.   Defendant had access to Bimbo's highly confidential cost-reduction strategy road map for the Western region, which included line closures, plant closures, new process improvements, formula optimizations, and new product launches. (*Id.* at 73-74.) The distribution of this road map was limited to vice presidents only, and Defendant was one of five people in the Western region who had access to it. (*Id.* at 101.)

20.   One product that Defendant is intimately familiar with is Thomas' English Muffins. (*Id.* at 81.) Thomas' English Muffins generate approximately $500 million in annual sales. (*Id.* at 84.)

21.   The secret process for making Thomas' English Muffins, and, specifically, their "nooks and crannies" texture, consists of three component parts, including the formula, manufacturing engineering design, and certain process parameters. (*Id.* at 81.) Information about each of these components is kept separate from information about the other components, with access to each limited to only those Bimbo employees who need to use it. (*Id.* at 81-82.) For additional security, process parameters are different between different plants, so that the process parameters used in one plant would not work in another. (*Id.* at 83.) Only a person with access to all three components could replicate the process for producing Thomas' English Muffins. (*Id.* at 81.)

6

22.   Defendant is one of seven people with knowledge of all three components and with sufficient experience to replicate Thomas' English Muffins given sufficient resources.  (*Id.* at 83.)

23.   Defendant also knows the highly sensitive promotional strategy for Thomas' English Muffins on the national level.  (*Id.* at 74.)

24.   Defendant had access to and knows confidential information pertaining to the development and production of Bimbo's premium bread products.  (*Id.* at 84-85.)

25.   Premium bread products are different from basic white bread products, which are essentially produced in accordance with the same formula regardless of the manufacturer.  (*Id.* at 63-64.)  Premium breads differentiate themselves on the basis of nutritional properties, ingredients, taste, and other factors that appeal to consumers who are attracted to those properties and not just the product's cost. (*Id.*)  Profit margins for premium bread products are far greater than they are for white bread.  (*Id.* at 66.)  Bimbo and its predecessor companies have been developing, producing and marketing premium bread products for over 17 years, and in the Western region it was the focus of their operations.  (*Id.* at 66, 86.) Bimbo is the national market share leader in the premium bread category.  (*Id.* at 86.)

26.   Defendant's knowledge relating to Bimbo's premium bread products includes product formulas, as well as information on costs, customer launches, and expected price points.  (*Id.* at 85.)

27.   The formula and process information for creating create Bimbo's premium bread

products is kept confidential within Bimbo by limiting access to the code books, keeping information compartmentalized, and making access available on a need-to-know basis.  (*Id.* at 87.)

28.  Oroweat is one of Bimbo's brand lines for premium bread products.  (*Id.* at 85.) Oroweat products were manufactured in the Western region under Defendant's supervision.  (*Id.* at 87.)  The projected sales volume for these products for 2010 is between $300 and $400 million. (*Id.* at 87.)

29.  With regard to Oroweat products, Defendant knows confidential product-specific information, such as formulas, pan-dough ratios, acidity measurements, and other attributes that affect the taste, keeping quality, softness, and texture of the products.  (*Id.* at 85.)  Defendant also knows the related business-side information, such as costs, customer launches, and expected price points.  (*Id.*)  Defendant, with his experience, would not need to have this information in writing in order to use it in the production process.  (*Id.*)

30.  Defendant also possesses confidential information relating to Bimbo's Sandwich Thins product.  (*Id.* at 89-90.)  Sandwich Thins is a new Bimbo product that has proven to be very successful, with sales revenues of $250 million in 2009, projected to rise to $350 million in 2010.  (*Id.* at 79-88.)  Bimbo spent approximately $18 million to develop and produce this product, and Defendant was very involved in launching it in the Western region.  (*Id.* at 88-89.)

31.  Defendant knows the cost positions, as well as the formulas and designs of many of Bimbo's products.  (*Id.* at 73.)  He also knows which customers Bimbo planned

to target for upcoming bids. (*Id.*)

32.    If Hostess were to acquire information with regard to Bimbo's capacity status—information which Defendant knows—it could gain a significant competitive advantage over Bimbo by lowering prices in locations where Bimbo is out of capacity.  (*Id.* at 102.)

33.    Defendant knows Bimbo's national strategy for sales initiatives and product launches for major customers such as Walmart, Costco, BJ's, and Sam's Club. (*Id.* at 101-02.)

34.    Defendant had access to Bimbo's pricing strategies, which are kept highly confidential, in part because they are different for each corporate customer.  (*Id.* at 103-06.)

35.    Defendant was one of fewer than five people who had access to Bimbo's private label bidding information in California in 2009.  (*Id.* at 104-05.)

36.    Defendant knows Bimbo's confidential information about its use of enzymes in straight dough processing, including supplier information and how and in what quantities they are used.  (*Id.* at 95-98.)  Bimbo's research in the enzyme field allowed it to develop techniques that resulted in cost savings in the millions of dollars and gave it a competitive advantage by reducing their use of enzymes to half of the amount used by its competitors.  (*Id.* at 97-98.)  Developing this enzyme technology took Bimbo approximately two and a half years, and only about ten people, including Defendant, had access to these processes in premium bread production.  (*Id.* at 98-99.)

37.    Bimbo spent about three years developing processes that enabled it to make premium bread products from scratch, rather than from pre-mixed ingredients. (*Id.* at 99-100.)  Defendant was one of five people in the Western region who learned that information in the course of implementing cost-reduction processes developed in the Eastern region.  (*Id.* at 101.)

38.    After accepting Hostess's offer on October 15, 2009, and until his separation from Bimbo on January 13, 2010, Defendant continued to have access to confidential information through documents that he received and meetings that he attended. (Botticella Dep. 91, 93-95, 97.)  During that period of time, he attended a strategy planning meeting, at which Bimbo's President was present and confidential information was discussed.  (*Id.* at 94-95.)

39.    Brian Harris, an expert in computer forensics, testified as an expert witness at the hearing, and his expert report was offered into evidence.  (Expert Report of E. Brian Harris ("Expert Report"), Ex. 1; Hr'g Tr. 23.)  Harris was a credible witness.

40.    Defendant first disclosed his plans to work for Hostess to Bimbo at approximately 10 a.m. P.S.T. on January 13, 2010, when he called Bimbo's Vice President of Human Resources in response to an earlier voice mail.  (Botticella Dep. at 113-15.)  At 10:12 a.m., Defendant accessed twelve company documents on his laptop computer.  (Ex. 1 at 16; Ex. 2; Hr'g Tr. 40.)  These documents included highly confidential Bimbo information.  (*See generally* Hr'g Tr. 107-25.)  The twelve documents were accessed within a period of 13 seconds, which is not consistent

10

with ordinary usage, such as opening and reading or otherwise using a document. (Ex. 1 at 16-17; Hr'g Tr. 39, 45.) Harris testified that this type of activity is, however, consistent with copying files to an external device. (Hr'g Tr. 40-43.)

41. Harris examined Defendant's laptop and determined that at least three external storage devices had been attached to it. (*Id.* at 27.) Two of them were identified during the hearing—one a USB flash drive[5] and the other an external hard drive. (*Id.* at 29-30.) The third device, which was another external hard drive, is unaccounted for. (*Id.* at 29-30, 34.) Defendant has provided no testimony or other evidence concerning the third external storage device.

42. Harris determined which files were accessed on Defendant's laptop between December 28, 2009, and January 13, 2010, as well as the time and date that each of those files was last accessed. (*Id.* at 35; Ex. 2.) Harris testified that those files were accessed while the laptop computer was turned on and Defendant was logged into it. (*Id.* at 56.) Beyond that, Harris was not able to determine who was actually using the computer. (*Id.* at 55-56.) The timestamps corresponding to each of those files in Exhibit 2 show that they were all last accessed during regular business hours.

43. Exhibits 9 through 25 are some of the documents accessed on Defendant's laptop computer between January 4 and January 13, 2010. (*Id.* at 38, 107; Exs. 2, 9-25.) These documents contain Bimbo's confidential strategic information. (Hr'g Tr.

---

[5] This is a portable external storage device, small in size, with a built-in adapter that allows it to plug directly into a computer's USB port. USB flash drives are highly portable and durable.

107.)

44. Approximately 15 minutes of videotaped excerpts from Defendant's deposition, in which he attempted to explain his access to confidential Bimbo documents on his laptop computer and his use of external storage devices, were offered into evidence by Plaintiff. Defendant's explanations were not credible. Essentially, he maintained that he was simply practicing with his computer to prepare himself for his new job. (Hr'g Tr. 31-32, 138-39.)

45. Defendant conceded that Bimbo would have restricted his access to confidential documentation if it had known that he intended to take a job with Hostess. (Botticella Dep. 91.) He maintained that because Bimbo was not aware of his relationship with Hostess and took no such precautions, he personally avoided looking at confidential sales documents and deleted them whenever he received them. (*Id.* at 91-92.) Defendant testified that he also made an effort to not look at certain other confidential documents during his last two months at Bimbo. (*Id.* at 125.) Defendant explained that he did so because he "didn't feel comfortable" looking at those documents. (*Id.*) For example, with regard to certain slides shown at a strategy meeting with Bimbo's President, Defendant testified that he "just blocked it right out of [his] head." (*Id.* at 97.)

46. Defendant could not explain why, after accidentally deleting some confidential presentations on his computer, he asked for them to be restored. (*Id.* at 136-37.)

47. Defendant's testimony with regard to his use of a USB flash drive or other external storage devices with his laptop was confusing at best. Defendant initially

testified that he had not used a USB flash drive[6] on his laptop since November or

December.  (*Id.* at 31-32.)  He claimed that he was trying to learn how to use it so

he would be more familiar using a computer at his job at Hostess.  (*Id.*)

Defendant also testified that he had never used storage external devices other than

for presentations.  (*Id.* at 39.)  However, later at the deposition, he testified that he

occasionally connected a USB flash drive to his computer to learn how to use it,

including during his last week at Bimbo.  (*Id.* at 138.)  Defendant attempted to

clarify that his earlier statements about last using a USB flash drive in December

referred to using it for a presentation.  (*Id.* at 145.)  Defendant did not explain why

he had earlier testified that he used external storage devices only for presentations,

since he also admitted to "practicing" with a USB flash drive on numerous

occasions.

48.     Defendant testified that it would be harmful to Bimbo if Hostess were to acquire

some of the documents that he received during his last few months at Bimbo.

(Botticella Dep. 125-26.)

49.     Dan Babin, Bimbo's Senior Vice President of Operations and Strategic Services,

testified that Exhibits 9 through 25, all of which Defendant had accessed between

January 4 and January 13, 2010, contain highly confidential Bimbo information.

(Hr'g Tr. 107.)  These documents pertain to Bimbo's strategies, competitive

position, and financial position, and are not directly related to the work that

---

[6] Defendant appears to have used the terms "memory stick" and "flash drive" interchangeably at his deposition to refer to USB flash drives.  (Botticella Dep. 31-32, 138-39, 145.)

Defendant was doing during that period of time.  (*Id.*)

50.    Documents in Exhibits 9 through 25 include Bimbo's cost-reduction strategies, product launch dates, anticipated plant and line closures, labor contract information, production strengths and weaknesses of many Bimbo bakeries, and the cost structure for individual products by brand.  (*Id.* at 107-25.)  All of this documentation is highly confidential even within Bimbo, and would be extremely harmful to Bimbo in the hands of a competitor.  (*Id.*)

51.    One of the documents, Exhibit 25, is a SWOT (Strengths, Weaknesses, Opportunities, and Threats) analysis, which is performed as part of annual strategy planning.  It is intended to be turned into an action plan in Bimbo's strategy document for the following year.  This SWOT analysis was prepared at the end of August of 2009 and is national in scope.  This document was confidential and its distribution was limited to Vice President level and above.  There was no reason for Defendant to access this document on his last day at Bimbo.  This document would be very valuable to Hostess and, conversely, very harmful to Bimbo in Hostess's hands, as it would give Hostess insight to the strengths and weaknesses associated with each of Bimbo's bakeries, including any capacity, quality, and labor issues.  (Ex. 25; Hr'g Tr. 111-13.)

52.    Another document, Exhibit 24, is the strategic road map that was developed to achieve $100 million in cost savings in the Western region in 2009.  In addition to planned activities, it contains details about tasks that were actually accomplished.  It also contains formula notes and consumer trial results, with details on how to

14

lower certain product costs.  For example, it includes formula information that would allow for savings of $800,000 to $1.5 million with respect to one of the several products on the list, the King sandwich product.  The road map is not limited to the Western region but contains Bimbo's national cost-reduction strategy.  Distribution of this document was limited to Vice President level and above.  If Hostess were to gain access to this document, that would be of concern to Bimbo, because the document contained such confidential information as product launch dates, counter strategies, cost-reduction strategies, and plant and line closures.  (Ex. 24; Hr'g Tr. 107-10.)

53.    Exhibit 21 is a strategic presentation for California, which is a template for conducting business reviews, including the agendas followed in the meetings.  It is dated August of 2009 and is stamped "Confidential" on the title page.  This document includes capacity information for certain facilities and information about Bimbo sourcing products from Mexico.  It also includes targeted private labels that were part of Bimbo's growth strategy in California.  This private label information was limited to no more than twelve people at Bimbo.  At least some of this information would be harmful to Bimbo in a competitor's hands, because it would allow a competitor to predict when Bimbo's costs would go up and the best time to enter certain markets to successfully compete with Bimbo.  There was no reason for Defendant to access this document on his last day at work.  (Ex. 21; Hr'g Tr. 113-16.)

54.    Another of these documents, Exhibit 19, is a California Manufacturing Strategy

15

and Execution Plan from July of 2009. This document includes sales, asset, labor, and cost information. The information in this document includes the profitability and cost of each of Bimbo's brands in California, which is highly sensitive internal information. This information would be of great interest and benefit to a competitor because the competitor could analyze Bimbo's profitability by brand and replicate the costs position and strategy by brand. This information would give a competitor great insight into opportunities for successfully competing against Bimbo. This document also contains Bimbo's labor strategy for California, including the expiration of present and future contracts, employee salaries, health benefits, and welfare and pension amounts. It also incorporates strategies for contract negotiations. This document would be especially valuable to Hostess because Hostess recently emerged from bankruptcy, gaining significant concessions from labor unions, and this document would provide the exact financial nature of the gap between Hostess's and Bimbo's labor costs. This and other information in the document would also allow a competitor to replicate Bimbo's labor costs per units produced, when entering a new area. Some of the cost indicators in this document are not limited to California but are national in scope. In addition, this document contains Bimbo's strategy for the sliced bread market for the next five years. The circulation of this document was very limited. The information in it is not available outside of Bimbo and it contains significantly more detail than would be provided to outside analysts. There was no reason for Defendant to access this document on his last day at work. (Ex. 19;

Hr'g Tr. 116-24.)

55.   Babin testified that there was no reason for Defendant to download any of these documents on his last workday.  (Hr'g Tr. 116-24.)  As Senior Vice President of Operations and Strategic Services, his concern was heightened by the fact that Defendant did not tell anyone at Bimbo that he had accepted a position with Hostess almost three months earlier.  (Hr'g Tr. 124.)  He was concerned that great harm could be done to Bimbo if these documents came into Hostess's possession. (*Id.*)

56.   Defendant's deposition testimony concerning his use of USB flash drives for practice was simply not credible.  Defendant's explanation with regard to his deletion of files from his computer was also not credible.  Defendant's testimony that he did not look at confidential Bimbo documents after accepting Hostess's job offer was not credible as well, especially in view of the fact that he attended meetings at which confidential information was presented and discussed. Moreover, Defendant chose not to testify at the hearing.  He did not explain his failure to tell Bimbo that he was taking a job with Hostess, his use of external storage devices, his copying of confidential Bimbo files, his treatment of Bimbo's confidential information, or his actions on his last day at work, even after he was confronted with expert testimony and other evidence that clearly suggested that his conduct was improper.[7]

---

[7] *See NLRB. v. United Slate, Tile & Composition Roofers, Damp & Waterproof Workers Ass'n*, No. 89-3388, 1992 WL 372381, at *14 (3d Cir. Aug. 10, 1992) (per curiam) ("[I]n a civil proceeding, an adverse inference could be drawn from [a witness's] refusal to testify 'in response

## II.    CONCLUSIONS OF LAW

1.    We have subject matter jurisdiction over this action under 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000 and there exists complete diversity of citizenship between Plaintiff, a citizen of both Delaware and Pennsylvania, and Defendant, a citizen of California.  (Compl. ¶¶ 4-5.)  *See In re Corestates Trust Fee Litig.*, 39 F.3d 61, 65 (3d Cir. 1994) ("In injunctive actions, it is settled that the amount in controversy is measured by the value of the right sought to be protected by the equitable relief.").  We also have personal jurisdiction over Defendant.  (*See* Confidentiality Agreement, Ex. 8 ¶ 15.)[8]

2.    In determining whether to issue a preliminary injunction, a court must consider four factors:  (1) the moving party's likelihood of success on the merits; (2) the extent to which the moving party will suffer irreparable harm if the injunctive relief is denied; (3) the extent to which the non-moving party will not suffer greater harm as a result of the injunctive relief; and (4) the public interest.  *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 556 (3d Cir. 2009) (quoting *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 356-57 (3d Cir. 2007)).  "'[W]hile the burden rests upon the moving party to make [the first] two requisite showings, the district court' should look to factors three and four when relevant."  *PB Brands, LLC v. Patel Shah Indian Grocery*,

---

to probative evidence offered against' him." (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 317-18 (1976))).

[8] The parties agree that pursuant to the this Agreement, Pennsylvania law should be applied in this matter.

No. 07-4394, 2008 WL 2622846, at *2 (E.D. Pa. June 6, 2008) (quoting *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994)).  Granting preliminary injunctive relief is an "extraordinary remedy," *Frank's GMC Truck Center, Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988), and "[a]ll four factors should favor preliminary relief before the injunction will issue," *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 374 (3d Cir. 1992).

**A.    Plaintiff Will Likely Prevail on Its Misappropriation of Trade Secrets Claim**

3.    The Pennsylvania Uniform Trade Secrets Act (PUTSA), 12 Pa. Cons. Stat. Ann. § 5301 *et seq.* (2004), defines a trade secret as:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>     (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>     (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. Cons. Stat. Ann. § 5302.

4.    Before the enactment of PUTSA in 2004, Pennsylvania courts looked to "substantial secrecy and competitive value to the owner" of the information in question to determine whether it constituted a trade secret.  *See O.D. Anderson, Inc. v. Cricks*, 815 A.2d 1063, 1070 (Pa. Super. Ct. 2003) (relying on the Restatement of Torts section 757, which states that "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over

competitors who do not know or use it") (quoting *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1228 (Pa. Super. Ct. 1989)).  Traditionally, Pennsylvania courts have considered the following factors in determining whether information constitutes a trade secret:

> (1) the extent to which the information is known outside the owner's business;  (2) the extent to which it is known by employees and others involved in the owner's business;  (3) the extent of measures taken by the owner to guard the secrecy of the information;  (4) the value of the information to the owner and to his competitors;  (5) the amount of effort or money expended by the owner in developing the information;  and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Christopher M's Hand Poured Fudge, Inc. v. Hennon*, 699 A.2d 1272, 1275 (Pa. Super. Ct. 1997) (quoting *Tyson Metal Prods., Inc. v. McCann*, 546 A.2d 119, 121 n.1 (Pa. Super. Ct. 1988)).  The courts have continued to consider these factors in analyzing potential trade secrets after the enactment of PUTSA.  *See Youtie v. Macy's Retail Holding, Inc.*, 626 F. Supp. 2d 511, 522 n.10 (E.D. Pa. 2009) ("The PUTSA displaced Pennsylvania's common law tort for misappropriation of trade secrets, but there is no indication that the statute effected a substantive shift in the definition of 'trade secret.'"); *see, e.g., Crum v. Bridgestone/Firestone N. Am. Tire, LLC*, 907 A.2d 578, 585 (Pa. Super. Ct. 2006) (quoting *O.D. Anderson*, 815 A.2d at 1070); *Pestco, Inc. v. Associated Prods., Inc.*, 880 A.2d 700, 706 (Pa. Super. Ct. 2005) (quoting *O.D. Anderson*, 815 A.2d at 1070; *Prudential Ins. Co. of Am. v. Stella*, 994 F. Supp. 318, 323 n.2 (E.D. Pa. 1998)).

20

5.      The confidential and proprietary information of Bimbo described in the Findings of Fact, which Defendant had access to and acquired during his employment at Bimbo, constitutes trade secrets under PUTSA.  These trade secrets include:

    a.    Information in Bimbo's code books, as well as and including formulas and designs for Thomas' English Muffins, Oroweat brand products, Sandwich Thins products, and other Bimbo products.

    b.    Bimbo's strategy for increasing profitability, embodied in a road map in January of 2009, which included line closures, plant closures, new process improvements, formula optimizations, and new product launches, and which achieved cost savings of $75 million over the course of a year.

    c.    Knowledge of how Bimbo produces bread "from scratch" instead of using pre-mixed ingredients.

    d.    Documents copied by Defendant from his work computer onto an external storage device with no credible explanation.  (Exs. 9-25.)

    e.    Bimbo's promotional strategies with respect to specific customers.

    f.    Bimbo's cost positions.

    g.    Identities of Bimbo's customers targeted for upcoming bids.

6.      As stated in our Findings of Fact, it took Bimbo a number of years and significant resources to develop some of this information, and it is of critical competitive value to Bimbo.  Knowledge of this information would allow a competitor to save valuable resources in not having to develop the same information and techniques and would allow it to introduce new processes or cost-saving measures

significantly sooner than it would otherwise be able to do so. *See Air Prods. &*
*Chems., Inc. v. Johnson*, 442 A.2d 1114, 1121-22 (Pa. Super. Ct. 1982)
(concluding that information "not generally known in the industry," which gave
the company "an advantage vis-a-vis its competitors who do not know these
facts," constituted trade secrets, where that information included details of
research and development projects and their relative priorities, projected capital
spending program, distribution plans, bidding procedures, the spending priorities
and budget of the defendant's division, and novel methods of operation for certain
markets"); *Den-Tal-Ez*, 566 A.2d at 1230 (noting that information with which one
company "can ascertain [a competitor's] pricing methods and more effectively
compete," such as "inventory data and projections, details unit costs and
product-by-product profit margin data[,] is protectible as trade secrets"); *see also*
*SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1260 (3d Cir. 1985) (finding that
"costing and pricing information" that includes "a whole range of data relating to
materials, labor, overhead, and profit margin, among other things" qualifies for
trade secret protection because, unlike the price of a specific product, "this is not
information that is readily obtainable by anyone in the industry"); *Air Prods.*, 442
A.2d at 1121 (concluding that the defendant's knowledge of market related
information, which included his former employer's market opportunities,
comprised trade secrets). In addition, Bimbo has taken extensive steps to
maintain the secrecy of this information. For example, it has restricted access to
and compartmentalized confidential information on its servers and it has entered

into confidentiality agreements with its employees.  Consequently, this

information is not available outside of Bimbo.  *See Den-Tal-Ez*, 566 A.2d at 1230

(concluding that secrecy precautions that included confidentiality agreements by

employees, and lack of evidence that the information had ever been disclosed to

the public, substantiated the conclusion that the owner of the purported trade

secrets took "'reasonable precautions under the circumstances to prevent

unauthorized disclosure'" (quoting *Greenberg v. Croydon Plastics Co.*, 378 F.

Supp. 806, 812 (E.D. Pa. 1974))).  These factors satisfy the criteria established by

PUTSA and support our conclusion that the information at issue constitutes trade

secrets of Bimbo.  12 Pa. Cons. Stat. Ann. § 5302.  We note that Defendant does

not challenge the status of this information as trade secrets in arguing against

injunctive relief.

7.    Under PUTSA, "misappropriation" of a trade secret includes:

> (1) acquisition of a trade secret of another by a person who
> knows or has reason to know that the trade secret was
> acquired by improper means; or
> (2) disclosure or use of a trade secret of another without
> express or implied consent by a person who:
>> (i) used improper means to acquire knowledge of the
>> trade secret;
>> (ii) at the time of disclosure or use, knew or had
>> reason to know that his knowledge of the trade secret
>> was:
>>> (A) derived from or through a person who had
>>> utilized improper means to acquire it;
>>> (B) acquired under circumstances giving rise
>>> to a duty to maintain its secrecy or limit its
>>> use; or
>>> (C) derived from or through a person who
>>> owed a duty to the person seeking relief to

23

> maintain its secrecy or limit its use; or
> (iii) before a material change of his position, knew or
> had reason to know that it was a trade secret and that
> knowledge of it had been acquired by accident or
> mistake.

12 Pa. Cons. Stat. Ann. § 5302.

8.    A court may enjoin threatened misappropriation of a trade secret in addition to

actual misappropriation. *Id.* § 5303(a).  When analyzing threatened

misappropriation of trade secrets, Pennsylvania courts apply the "inevitable

disclosure doctrine."  *See Air Prods.*, 442 A.2d at 1120; *Victaulic Co. v. Tieman*,

499 F.3d 227, 234 (3d Cir. 2007) (citing *Air Prods.*, 442 A.2d at 1123).  That

doctrine essentially posits that "a person may be enjoined from engaging in

employment or certain aspects of his employment where that employment is likely

to result in the disclosure of information, held secret by a former employer, of

which the employee gained knowledge as a result of his former employment

situation. *Air Prods.*, 442 A.2d at 1120.  The scope of the injunctive relief

depends on the particular circumstances of the case.  *Victaulic*, 499 F.3d at 234.

9.    In applying the inevitable disclosure doctrine, a court must evaluate the likelihood

that the ex-employee will disclose his former employee's trade secrets in the

course of his new employment.  Bimbo argues that the proper standard is whether

"disclosure is *likely*," that is, whether Defendant's employment at Hostess is likely

to result in the disclosure of Bimbo's trade secrets.  (Doc. No. 16 ¶ 15, at 16.)

Defendant argues that injunctive relief is only warranted if disclosure of trade

secrets will be *inevitable* in the course of Defendant's employment at Hostess, or,

24

in other words, if it would be impossible for Defendant to work at Hostess without disclosing Bimbo's trade secrets.  (Doc. No. 15 ¶¶ 2, 5(a), at 5-7.)  Defendant contends that the *Air Products* case was "misapplied" in later cases that improperly lowered the burden on the party seeking injunctive relief.  (Doc. No. 17 at 3.)

> The *Air Products* court summarized the applicable standard as follows:

>> Under Pennsylvania law, a person may be enjoined from engaging in employment or certain aspects of his employment where that employment is likely to result in the disclosure of information, held secret by a former employer, of which the employee gained knowledge as a result of his former employment situation.

442 A.2d at 1120.  The *Air Products* court actually noted that it did "not adopt the reasoning of the trial court or its use of the term inevitable" and affirmed the trial court's entry of an injunction because it was "unable to find that the trial court committed reversible error."  *Id.* at 1124.  Our analysis of the case law supports the view that the sufficient likelihood or substantial threat of disclosure of a trade secret need not amount to its inevitability.[9]  Since it is difficult for courts to

---

[9] Defendant specifically points our attention to *Bacharach, Inc. v. Testo, Inc.*, No. 1257 WDA 2000 (Pa. Super. Ct. Sept. 4, 2001) (unpublished), which discusses *Air Products* and, according to Defendant, places the higher "impossibility" burden on a plaintiff.  (Doc. No. 17 at 4-5; Doc. No. 15 ¶ 5(a), at 7.)  The *Bacharach* case, however, supports our interpretation of *Air Products*.  The *Bacharach* court did note that its "resolution in *Air Products* was not based on the mere 'likelihood' of disclosure," as the *Air Products* court had found that "'it would be impossible for the employee to perform his duties at the new employer without disclosing trade secrets.'"  *Bacharach*, No. 1257 WDA 2000, slip op. at 13-14.  More importantly, however, the *Bacharach* court referred to its holding in *Air Products* as "merely" a finding that "the trial court did not commit reversible error," rather than "enshrin[ing] the 'inevitable disclosure' doctrine as an inviolable rule of law."  *Bacharach*, No. 1257 WDA 2000, slip op. at 9 (observing that the court's "endorsement of the concept of inevitable disclosure was conditioned upon both the

predict future events to the degree of "inevitability" or "impossibility," the standard should be a practicable one within the context of issuing a preliminary injunction.[10]  The standard applied by the *Den-Tal-Ez* court—whether there exists "ample evidence showing at least a substantial threat" of disclosure of a trade secret—is appropriate.  566 A.2d at 1232 (characterizing the inquiry under *Air Products* as "whether there is sufficient likelihood, or substantial threat, of defendant [disclosing a trade secret] in the future" (citing *Air Prods.*, 442 A.2d at 1122-25)).  In *Den-Tal-Ez*, the Pennsylvania Superior Court upheld an injunction entered by the trial court, even while it disagreed with the trial court's finding that disclosure "would be inevitable" in the absence of an injunction.  566 A.2d at 1232.  The court reasoned that "[a]lthough the trial court in the instant case may have overstated the situation when it said that disclosure would be 'inevitable' . . . , we nonetheless find the injunction warranted and not overbroad" because the totality of the evidence "establish[ed] a substantial likelihood that [trade secret] information will be disclosed" in the absence of injunctive relief.  *Id.* at 1232-33.  We are satisfied that the proper standard here is whether the evidence shows at least a substantial threat of disclosure of a trade secret.

10.    Courts often apply the inevitable disclosure doctrine when discussing irreparable harm to the plaintiff.  That approach conflates the irreparable harm and the

---

specific facts raised in *Air Products* and the limitations of our standard of review").

[10] In addition, if the standard required a showing of "inevitability," it would take away a court's ability to consider the ex-employee's trustworthiness and credibility in its evaluation.

likelihood of success prongs of the preliminary injunction standard.  In the context

of threatened, rather than actual, misappropriation of a trade secret, the

inevitability of the trade secret's disclosure correlates to the likelihood that the

plaintiff will prevail on its threatened disclosure claim, as well as to the

immediacy of the irreparable harm that the plaintiff will suffer in the absence of

injunctive relief.  Thus, if a plaintiff establishes the likelihood of its success on the

merits by showing a substantial threat of disclosure, then the extent of irreparable

harm to the plaintiff can be addressed based on the nature of the trade secret and

the effect its disclosure would have on the plaintiff in the absence of injunctive

relief.

11.    Applying the inevitable disclosure doctrine to the instant facts, we conclude that

Bimbo has presented more than sufficient evidence to establish that there exists at

least a substantial threat that Defendant will disclose Bimbo's trade secrets in the

course of his employment at Hostess.

12.    Defendant's position at Hostess as Vice President Bakery Operations, East, is

substantially similar to his last position with Bimbo.  It is an executive level

position, with a salary comparable to his salary at Bimbo.  In this position,

Defendant would report to Hostess's Senior Vice President for Bakery Operations.

(Ex. 3.)  Significantly, Defendant did not testify or provide evidence or testimony

that would refute Plaintiff's evidence of the similarity of the positions.

13.    In addition, Defendant's conduct before leaving Bimbo, in not disclosing to

Bimbo his acceptance of a job offer from a direct competitor, remaining in a

position to receive Bimbo's confidential and trade secret information and, in fact, receiving such information after committing to the Hostess job, and copying Bimbo's trade secret information from his work laptop onto external storage devices, demonstrates an intention to use Bimbo trade secrets during his intended employment with Hostess. *See Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-93 (3d Cir. 1992) (focusing on the temporal aspect of injury to the plaintiff from the possible disclosure of its trade secret and noting that an "intention to . . . disclose [a trade secret] to a competitor will almost certainly show *immediate* irreparable harm" (emphasis added) (citing *SI Handling*, 753 F.2d at 1264)). Defendant has provided no evidence that would refute this conclusion, and we may reasonably draw the corresponding inference. *Cf. SI Handling*, 753 F.2d at 1261 (finding that "the failure of the appellants to testify in answer to [the plaintiff's] strong showing justifies the inference that their testimony would be unfavorable to their cause"). Defendant's deposition testimony provides support for this inference, as he conceded that Bimbo would have cut off his access to confidential Bimbo information if it had known that he accepted employment with Hostess. (Botticella Dep. 91, 118.) Defendant's explanation that he attempted to limit his exposure to confidential Bimbo documents during this time only underlines the impropriety of the circumstances under which he continued to be exposed to and learn of Bimbo's trade secrets until his separation from Bimbo. (*Id.* at 92, 93-95, 97.)

14. The fact that one of the external devices onto which Defendant copied Bimbo's

trade secret information has not been recovered or returned to Bimbo, supports the inference that Defendant intends to use those trade secrets at Hostess.

15. Defendant's knowledge of Bimbo's trade secrets, combined with evidence of an intention to use them at Hostess, creates a realistic expectation that Defendant will draw on and will use his knowledge of Bimbo's trade secrets in performing his job at Hostess. Based upon the totality of the evidence, we are satisfied that there is a substantial likelihood that Defendant will not be able to perform his duties at Hostess and will not perform those duties without disclosing, whether intentionally or inadvertently, Bimbo's trade secrets.

16. Defendant points to his "Acknowledgment and Representation Form," which he signed on December 7, 2009, before Bimbo even knew he was leaving, and in which he affirms that he will not disclose Bimbo's proprietary and confidential information to Hostess. (Ex. 7.) Defendant's reliance on that document is unconvincing. Defendant's handling of Bimbo's trade secrets after accepting the Hostess position undermines his trustworthiness with regard to those trade secrets. *Cf. PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1270 (7th Cir. 1995) (quoting the district court's finding that the ex-employee's "lack of forthrightness on some occasions, and out and out lies on others, in the period between the time he accepted the position with [his new employer] and when he informed [his then-employer] that he had accepted that position leads the court to conclude that [the defendant] could not be trusted to act with the necessary sensitivity and good faith under the circumstances in which the only practical verification that he was not

29

using plaintiff's secrets would be [the defendant's] word to that effect"). In addition, Defendant has presented no evidence regarding any steps that he or Hostess will take to prevent disclosure during his employment with Hostess. We seriously doubt that Defendant will somehow clear his mind of Bimbo's trade secret information when working on related tasks at Hostess. *Cf. Union Carbide Corp. v. UGI Corp.*, 731 F.2d 1186, 1191 (5th Cir. 1984) (finding a substantial likelihood of disclosure of a trade secret where the new employer "took no precautions to insulate [the employee in question] from the strategy meetings with obvious potential for conflict," at one of which the disclosure of a trade secret appeared to have actually taken place "either directly or by subtle influence"); *PepsiCo*, 54 F.3d at 1269 (noting that unless the defendant "possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about [his new employer's products] by relying on his knowledge of [his ex-employer's] trade secrets" concerning strategic plans for the market).

17.   We are compelled to conclude that the evidence demonstrates a substantial likelihood, if not an inevitability, that Defendant will disclose or use Bimbo's trade secrets in the course of his employment with Hostess. *See* 12 Pa. Cons. Stat. Ann. § 5302 (defining "misappropriation" of a trade secret).

18.   We conclude that Plaintiff has demonstrated a sufficient likelihood of prevailing at trial on its Misappropriation of Trade Secrets claim.

**B.   Plaintiff Will Suffer Irreparable Harm in the Absence of an Injunction**

19.   We have concluded that Bimbo has demonstrated a sufficient threat of

misappropriation of its trade secrets by Defendant to satisfy the "likelihood of success on the merits" prong of the preliminary injunction standard. Thus, we must determine the extent of irreparable harm to Bimbo from the disclosure of those trade secrets in the absence of a preliminary injunction.

20. "Harm is irreparable when it cannot be adequately compensated in damages, either because of the nature of the right that is injured, or because there exists no certain pecuniary standards for the measurement of damages." *National Business Services, Inc. v. Wright*, 2 F. Supp. 2d 701 (E.D. Pa. 1998) (citing *Albert E. Price, Inc. v. Metzner*, 574 F. Supp. 281, 289 (E.D. Pa.1983)).

21. As we noted above, having determined that there is a substantial threat of disclosure, we must analyze the nature of the trade secrets at issue and the effect of their disclosure on Bimbo to determine if the harm to Bimbo will be irreparable in the absence of injunctive relief.

22. Although Defendant's position at Bimbo was in the Western region of the United States and his position at Hostess will be in the East, many of Bimbo's trade secrets that he was privy to were not restricted to Bimbo's operations in California or the Western region but were national in scope.

23. Defendant's disclosure or use of Bimbo's trade secrets at Hostess would enable Hostess to anticipate Bimbo's actions in bidding, distribution, packaging, pricing, and marketing, giving it a competitive edge in those areas.

24. Defendant's disclosure or use of Bimbo's trade secrets at Hostess would allow Hostess to reduce its operating costs by implementing Bimbo's proprietary—and

proven—efficiency and cost-cutting methods, where it would otherwise take Hostess a potentially significant expenditure of time and resources to achieve similar results.

25.    Defendant's disclosure or use of Bimbo's trade secrets at Hostess would enable Hostess to anticipate Bimbo's capacity constraints and successfully compete with Bimbo in affected markets.

26.    Defendant's disclosure or use of Bimbo's trade secrets at Hostess would enable Hostess to analyze Bimbo's cost and profitability data by product brands and adjust its operations accordingly to more successfully compete with certain brands.

27.    Defendant himself testified that if Hostess were to acquire some of the documents that he received during his last few months at Bimbo, that would be harmful to Bimbo.

28.    Because of the nature of the trade secrets at issue, if Defendant were to utilize Bimbo's trade secrets for Hostess's benefit, it would change Hostess's competitive standing vis-a-vis Bimbo.

29.    A change in competitive standing between Bimbo and Hostess would likely affect each company's market share in the national market for baked goods.

30.    Because Hostess presumably has its own internal processes different from those of Bimbo, any implementation or use of Bimbo's trade secrets at Hostess would likely occur in combination with the use of Hostess's own processes. The benefit to Hostess from the use of Bimbo's trade secrets would thus be difficult, if not

impossible, to isolate.  Consequently, it would be impossible to determine what portion of Hostess's cost savings or profits are attributable to the misappropriated trade secrets.

31.    Moreover, a change in competitive standing between two of the four major competitors in the baking industry is not quantifiable in monetary terms and hence not capable of being redressed by a legal remedy.  This is especially so where the disclosure of the trade secrets of one company would place the other in a market position that it would otherwise not achieve for months or years.

32.    Consequently, the harm to Bimbo from the disclosure of its trade secrets by Defendant to Hostess could not be compensated by damages.

33.    We are satisfied that Plaintiff will suffer irreparable harm in the absence of injunctive relief.

**C.    The Harm to Defendant from the Issuance of the Injunction is Outweighed by the Potential Irreparable Harm to Plaintiff if the Injunction Is Not Issued**

34.    The harm of Bimbo's trade secrets being disclosed to or utilized by Hostess outweighs the harm to Defendant from not being able to commence employment at Hostess pending a final determination in this matter.

35.    Defendant's argument that an injunction would be equivalent to preventing Defendant "from being employed at all" because "the number of executive positions within Mr. Botticella's expertise is . . . extremely limited" is misplaced. This is a preliminary injunction, and its issuance will enjoin Defendant from working for Hostess only until a final determination on the merits.  That

33

determination will be made within the next two months.  In the meantime,

Defendant will be receiving compensation for the eleven weeks of vacation time

that he accrued before leaving Bimbo.  The irreparable harm to Bimbo from the

disclosure of its trade secrets outweighs the harm to Defendant.

**D.    The Public Interest Favors the Issuance of the Injunction**

36.    There is a general public interest in the upholding the inviolability of trade secrets

and enforceability of confidentiality agreements.

37.    Defendant has suggested that Hostess's freedom to hire whom it wishes should be

viewed as a public interest factor because Hostess is not a party to this litigation.

The public interest in preservation of Bimbo's trade secrets outweighs the public

interest in Hostess's ability to hire without delay whomsoever it wishes, where the

specific hiring in question impinges on the trade secrets of Hostess's direct

competitor.

38.    Notably, the Third Circuit has observed in a procedurally similar case that it is

"not necessary for the district court to engage in extended analysis of the public

interest—extensive precedent supports an injunctive remedy where the elements

of a trade secret claim are established."  *SI Handling*, 753 F.2d at 1265.

**IV.    CONCLUSION**

39.    Based upon the foregoing Findings of Fact, we are satisfied that a narrowly drawn

injunction that would allow Defendant to commence employment at Hostess

would not sufficiently protect Plaintiff and would be inappropriate.

Accordingly, Plaintiff's  Motion for Temporary and Preliminary Injunction and Other

Relief will be granted.

      An appropriate Order follows.

BY THE COURT:

_____

R. Barclay Surrick, J.